91 So.2d 353

**RICHARDSON & BASS (Louisiana Account)**

v.

**BOARD OF LEVEE COMMISSIONERS OF The ORLEANS LEVEE DISTRICT et al.**

No. 42057.

June 30, 1955.

On Rehearing Feb. 20, 1956.

On Second Rehearing Nov. 5, 1956.

On Amendment of Second Rehearing Nov. 21, 1956.

Appeal Dismissed Dec. 17, 1956.
See 77 S.Ct. 325.

James David McNeill, Kalford K. Miazza, Clem H. Sehrt, New Orleans, for Orleans Levee Bd., appellant.

Leander H. Perez, Charles J. Rivet, New Orleans, for Police Jury of Plaquemines Parish, appellee.

Plauche & Plauche, S. W. Plauche, Jr., New Orleans, for Delta Development Co., Inc., appellee.

William M. Campbell, Jr., New Orleans, for John E. Pottharst, Sr., intervenor.

Provosty, Sadler & Scott, Alexandria, for Richardson & Bass (Louisiana Account).

HAWTHORNE, Justice.

This is a concursus proceeding instituted by Richardson & Bass (Louisiana Account), the operator of Cox Bay Unit No. 2, in which there are four producing wells designated as Wells Nos. 4–H, 6–H, 7–H, and 14–H. Richardson & Bass deposited in the registry of the court the proceeds of 55 per cent of the royalty oil and gas produced from Cox Bay Unit No. 2, alleged a dispute over ownership of land in this unit and conflicting claims to the royalties, and prayed that the claimants of this royalty oil and gas be cited to appear and assert their respective claims and that there be judgment distributing the sum deposited, as well as any future sums which might accrue and be deposited, to the owner or owners thereof.[1]

The claimants of the royalties are the Board of Levee Commissioners of the Orleans Levee District, the Plaquemines Parish Police Jury, which is the governing authority of the Grand Prairie Levee District, and Delta Development Company, Inc. Both the Orleans Levee Board and the

Grand Prairie Levee District claim the ownership of land situated in the Parish of Plaquemines described as the S½ of Section 18, T. 18 S., R. 16 E., which forms part of Cox Bay Unit No. 2. Delta Development Company claims an interest in the royalties under a lease from Grand Prairie Levee District.

The operator, Richardson & Bass, holds two mineral leases both of which cover, among other lands, the property described above. One lease was executed by Grand Prairie and the other by Orleans. The Grand Prairie lease was executed on July 20, 1936, in favor of Delta Development Company, Inc., as lessee, and Grand Prairie Levee District reserved to itself a ⅛ royalty. Subsequently Delta Development Company executed a sublease in favor of Richardson & Bass in which Delta reserved to itself a ¼8 overriding royalty. The Orleans lease was executed in favor of Richardson & Bass on March 30, 1950, and the Orleans Levee Board reserved to itself a ³⁄₁₆ royalty.

It will thus be seen that the royalties reserved in these acts of lease are:

(1) ⅛ to Grand Prairie and ¼8 to Delta, or a total of ⅞8; and

1. The other 45 per cent of the proceeds of the royalty oil and gas produced from Cox Bay Unit No. 2 is conceded to be due to the State of Louisiana under a lease from it, and the State's title is not involved in the present controversy.

The lease from the State of Louisiana by its terms covers "All State owned water bottoms, including the beds of all rivers, bayous, lakes and streams * *" in Cox Bay Unit No. 2.

(2) 3/16, or 9/48, to Orleans.

The land here in controversy covered by these leases was pooled with property covered by a lease from the State of Louisiana, and by these pooling agreements Cox Bay Unit No. 2 was created. Under these agreements 45 per cent of the royalty oil and gas produced from the unit is payable to the State of Louisiana and is not involved in this suit. The royalties due from the other 55 per cent of the oil and gas produced from the unit are those which are in dispute in this concursus proceeding.

John E. Pottharst, Sr., as owner of $10,-000 of bonds issued by Grand Prairie Levee District, intervened in this concursus proceeding, espousing the claim of Grand Prairie Levee District to ownership of the land in question and opposing the claim of Orleans Levee Board. Pottharst contends that these bonds are secured by a mortgage on the disputed land, and that, if the claim of the Orleans Levee Board is recognized, the obligation of the contract under which these bonds were issued would be impaired.

The lower court in its judgment recognized Grand Prairie Levee District to be the last record owner of the property described, and recognized its lease to Delta Development Company, Inc., and Delta's sublease to Richardson & Bass (Louisiana Account), the operator. Accordingly the court recognized Grand Prairie Levee District as being entitled to 1/8 of 55 per cent

of the minerals produced by the operator, Richardson & Bass (Louisiana Account), from the four producing wells in Cox Bay Unit No. 2, and recognized Delta Development Company as being entitled to 1/48 of 55 per cent of these minerals, and ordered the funds on deposit to be so distributed. The judgment of the lower court also maintained the intervention of John E. Pottharst, Sr., and rejected all claims of the Orleans Levee Board. From this judgment the Orleans Levee Board appealed.

Claimant Grand Prairie Levee District was created by Act 24 of 1898, which provided for the transfer to it of certain State-owned lands embraced within the area of the district thus created. Pursuant to this act the Register of the State Land Office conveyed to this levee district the S½ of Section 18, T. 18 S., R. 16 E., which, as we have stated, forms a part of Cox Bay Unit No. 2. This act of conveyance was dated January 18, 1905, and is recorded in Conveyance Book 39, Folio 105, of the records of Plaquemines Parish. Grand Prairie has never divested itself of title to this property and is, according to the conveyance records of Plaquemines Parish, the last record owner of it. This deed from the State is the basis of Grand Prairie's claim to royalties from the producing wells in Cox Bay Unit No. 2.

The Orleans Levee Board claims these royalties, contending that it was vested

with title to the land by the provisions of certain acts of the Legislature.

By Act 99 of 1924 the Legislature, in order to protect the City of New Orleans from flood waters of the Mississippi River, authorized the Board of Commissioners of the Orleans Levee District to construct on the east bank of the Mississippi River in Plaquemines Parish a spillway or waste weir, to be located and designed according to plans and specifications to be approved by the State Board of Engineers and the Mississippi River Commission. This act authorized the Orleans Levee Board to acquire by purchase, donation, or expropriation the lands necessary for the construction of such works, and required the Orleans Levee Board to pay for all lands privately owned "within the area covered by the proposed plan from the upper to the lower limits thereof and from the Mississippi River to the sea". The act also provided that the Orleans Levee Board was to arrange with Grand Prairie for the acquisition of the bonded and other indebtedness of the Grand Prairie Levee District in the area to be affected by the proposed work.[2]

Pursuant to the authority of this act the Orleans Levee Board removed approximately 11 miles of the existing levee on the east bank of the Mississippi River in Plaquemines Parish and constructed what is termed a "back levee", located 2,500 to 3,000 feet back of the Mississippi River, from the lower line of the Bohemia Plantation to the upper line of the Cuselich Canal. Levees at the lower line of the Bohemia Plantation and at the upper line of Cuselich Canal were also constructed to connect the back levee with the existing levees along the east bank of the Mississippi. In the back levee there were certain openings through which in times of high water the waters from the Mississippi River flowed into a large canal, also constructed by the Orleans Levee Board, on the east or sea side of the back levee. After entering this canal the waters then flowed into bayous or streams and ultimately to the sea. This spillway is commonly known as the Bohemia Spillway.[3]

Following the adoption of Act 99 of 1924, which authorized the construction of the spillway, the Legislature adopted Act 246 of 1928 (R.S. 38:991 et seq.) which had for its purpose to amend and reenact Act 24 of 1898, the act creating the Grand Prairie Levee District. This amending act provided that all territory therein described, which was located in the Parish of Plaquemines on the east bank of the Mis-

---

2. This same requirement was made as to the indebtedness of the East Bank Levee District.

3. The case of Emery v. Orleans Levee Board; 207 La. 386, 21 So.2d 418, is authority for the proposition that State-owned lands located in the spillway itself were by the provisions of Act 99 of 1924 dedicated and set aside for public use. The lands in the instant case are not in the spillway itself.

sissippi River and adjoining the spillway area on the south, was to be embraced in the limits of, and should constitute, a levee district known and styled as the Grand Prairie Levee District.

In this amending act all lands within the levee district as reorganized were made subject to taxation, local assessment, etc., in order to raise funds to construct and maintain in this new district levees to protect the lands of the district from overflow. In order to provide additional means to carry out the purposes of the act and to furnish resources to enable the levee district to develop and establish a complete levee system in the district; all lands then belonging to the State, or that might thereafter belong to the State, and embraced within the limits of the district as therein constituted were conveyed to the Grand Prairie Levee District, and the district was given power and authority to sell, mortgage, pledge, and dispose of such lands.

It will thus be seen that this 1928 amending act recreated and reestablished the Grand Prairie Levee District in the Parish of Plaquemines in territory below the spillway area, and divested it of all rights and relieved it of all duties in the area of the spillway which it had formerly had under the provisions of Act 24 of 1898.

In 1942 the Legislature adopted Act 311, which according to its title, was an act "to confirm and quiet the Board of Levee Commissioners of the Orleans Levee District in the ownership and control of all public lands in the Bohemia Spillway when it was constructed by said Levee Board in obedience to Act 99 of the Legislature of 1924".

In the preamble to the 1942 act the Legislature recognized that the Orleans Levee Board was authorized and required by Act 99 of 1924 to construct the Bohemia Spillway in the Parish of Plaquemines in the *then Grand Prairie Levee District;*[4] that, with the consent and approval of the State Board of Engineers and the United States authorities, the Orleans Levee Board located this spillway in the Grand Prairie Levee District "in the entire area from the lower line of the Bohemia Plantation to the upper line of the Cuselich Canal, embracing all the area in those limits between the Mississippi River and the sea"; that the spillway had been in existence for 16 years; that the Orleans Levee Board had paid to the Grand Prairie Levee District the entirety of its outstanding indebtedness and "was thereby entitled to and invested with all the rights, title and interest" of Grand Prairie Levee District "in the entire area of said spillway where the property was dedicated for said uses", and that the former rights of Grand Prairie Levee District accrued to and became the rights and property of the Orleans Levee Board; that

4. In discussing this act we have omitted all reference to the East Bank Levee District.

the Legislature by Act 246 of 1928 recreated and reorganized the Grand Prairie Levee District in the section below the spillway, from Cuselich Canal, above, to Cubitt's Gap, 15 miles below its former lower boundary, and that the Grand Prairie Levee District had been removed and ousted from the spillway.

Section 1 of this act reads as follows:

"Be it enacted by the Legislature of Louisiana, *That the right, title, ownership and possession of the Board of Levee Commissioners of the Orleans Levee District to all public lands in the area of the Bohemia Spillway between the Bohemia Plantation, above, and Cuselich Canal, below, and from the river to the sea* subject to whatever valid leasehold rights as may have been granted by the Grand Prairie Levee District on lands previously granted and conveyed to it, prior to the passage of this Act, *be now confirmed, quieted and acknowledged,* it being recognized that said rights, ownership and possession came into existence when said Orleans Levee Board located and constructed said Bohemia Spillway in the year 1925." (Italics ours.)

Both the Orleans Levee Board and the Grand Prairie Levee District are creatures or agencies of the State, and, as between them and the State, the State is at

liberty to revoke any grant of land made by it to one district and to vest title in the other. Grand Prairie Levee District acquired the property in question from the State pursuant to the provisions of Act 24 of 1898, and the State under the plain provisions of Section 1 of Act 311 of 1942, which is unambiguous, clear, and not susceptible of judicial interpretation, has confirmed, quieted, and acknowledged the right, title, ownership and possession of Orleans Levee Board to this property.

This act of 1942 is a legislative conveyance, vesting title in the Orleans Levee Board without necessity of formal act of conveyance. By its very terms it vests in the Levee Commissioners of Orleans Levee District the right, title, ownership, and possession of all public lands "in the area of the Bohemia Spillway between Bohemia Plantation, above, and Cuselich Canal, below, and from the river to the sea", and the S½ of Section 18, T. 18 S., R. 16 E., is conceded to be in this area.

The 1942 act granted and confirmed the title of the Orleans Levee Board to all public lands in the spillway area in the Parish of Plaquemines.[5] Since this was the purpose of the act, its adoption by the Legislature had the effect of divesting Grand Prairie of its title to any lands in the spillway area; or, in other words, the act ef-

---

5. The Legislature by the plain terms of Act 311 of 1942 vested, quieted, and confirmed title in the Orleans Levee Board to all public lands within the area described in the act, and did not convey title to any water bottoms, such as the beds or bottoms of rivers, bays, bayous, lakes, and streams.

fectively revoked the grant to Grand Prairie made by Act 24 of 1898 of the lands in the spillway area and vested title to these lands in the Orleans Levee Board. In adopting the 1942 act the Legislature recognized and took cognizance of the provisions of Act 99 of 1924, authorizing the construction of the spillway, and Act 246 of 1928, recreating the Grand Prairie Levee District and ousting it from the area of the spillway.[6]

As we have heretofore pointed out, Section 1 of Act 311 of 1942 confirmed the title of the Orleans Levee Board to all public lands in the spillway area. This confirmation of title, however, was made *"subject to whatever valid leasehold rights as may have been granted by the Grand Prairie Levee District on lands previously granted and conveyed to it, prior to the passage of this Act"*. (Italics ours.)

Act 99 of 1924 authorizing the construction of the spillway did not locate or describe the spillway area. It provided only for the construction of the spillway in the Parish of Plaquemines on the east bank of the Mississippi River, to be located and designed according to plans and specifications to be approved by the State Board of Engineers and the Mississippi River Commission. This act authorized the Orleans Levee Board to acquire by purchase or expropriation all lands privately owned within the area covered by the proposed plan from the upper to the lower limits thereof and from the Mississippi River to the sea. Even this provision, however, did not fix the upper and lower limits of the proposed spillway. In other words, the Legislature in 1942 obviously took full cognizance of the fact that anyone relying on the public records and even on the provisions of the 1924 act itself could not definitely ascertain the spillway area.

The 1942 act did, however, definitely fix the spillway area as being located "between the Bohemia Plantation, above, and Cuselich Canal, below, and from the river to the sea". Since this area had not been definitely fixed by the 1924 act, the Legislature saw fit in the 1942 act, which confirmed and quieted the title of the Orleans Levee Board to all public lands in this area, to provide—as it had a right to do—that the title of Orleans Levee Board was subject to whatever valid leasehold rights as may have been granted by Grand Prairie Levee District prior to the passage of the 1942 act on lands which had been previously granted or conveyed to the Grand Prairie Levee District.

The S½ of Section 18, which had been conveyed to Grand Prairie Levee District by the State in 1905, and of which it was the owner of record, was leased by Grand Prairie to Delta Development Company in

6. Act 99 of 1924 was expressly repealed by Section 2 of the Revised Statutes of 1950.

1936, before the adoption of Act 311 of 1942. Consequently, under the provision which we have quoted from Section 1 of the 1942 act, the Orleans Levee Board's title was confirmed subject to these valid leasehold rights of Delta Development Company. In other words, the lease from Grand Prairie to Delta conferred valid leasehold rights on Delta and its sublessee, Richardson & Bass, the operator, and Delta Development Company is entitled to receive the overriding royalty reserved by it in its sublease to Richardson & Bass. Orleans Levee Board, however, as the present fee owner of the property, is entitled to receive the lessor's royalty reserved in the Grand Prairie lease. Grand Prairie, having been divested of title, is not entitled to any royalty from the four producing wells in Cox Bay Unit No. 2.

Since there was in existence an oil and gas lease on this property executed in 1936 by Grand Prairie to Delta Development Company, the subsequent oil and gas lease granted by Orleans to Richardson & Bass in 1950 is invalid and has no force and effect, the royalty reservation contained in the Orleans lease has no force and effect, and Richardson & Bass is not bound to pay any royalties under the Orleans lease.

The land here involved, the S½ of Section 18, is located on the east or sea side of the so-called back levee constructed by Orleans Levee Board, and approximately one mile from this back levee. It is argued that this land has never been a part of the Bohemia Spillway, is wholly outside the limits of the spillway, and has never been inundated by, or received, any waters from the Mississippi River, and that for these reasons Grand Prairie has never been divested of its title to the land by any of the acts of the Legislature relied upon by the Orleans Levee Board.

It is true that these lands are not located in the spillway itself, that is, between the river and the back levee. Be that as it may, the Legislature in the 1942 act confirmed and quieted title in the Orleans Levee Board to all public lands in the *spillway area* and defined this area with certainty to be the area between the Bohemia Plantation, above, and Cuselich Canal, below, and from the river to the sea. The lands here involved are in the spillway area as so defined.

Appellees argue, however, that Act 311 of 1942, which we have held quieted, confirmed, and acknowledged the right, title, and ownership of the Orleans Levee Board to the lands in question, is unconstitutional in that this act violates Article 3, Section 16, of the Louisiana Constitution, which provides that every statute enacted by the Legislature shall embrace but one object and shall have a title indicative of its object.

In Ricks v. Department of State Civil Service, 200 La. 341, 8 So.2d 49, this court

pointed out that it was not the purpose of this constitutional provision to require that the title be an index to the contents of the act, or that every end and means convenient or necessary for the accomplishment of the general object of the act be set out at length in the title, but it is deemed sufficient under the article if the act contains but one object and if the object be fairly stated, although it be expressed in general terms, in the title of the act. Moreover, all things proper or necessary to carry out the general object as stated in the title are deemed to be within the scope of the title. The test is primarily whether the various provisions of the act are germane to the object of the act as expressed in the title.

Obviously Act 311 of 1942 has but one object, and we think the title is clearly indicative of that object and that the provisions of the act are germane to the object as expressed in the title.

█ Appellees next argue that the 1942 act violates Article 4, Section 12, of the Louisiana Constitution, which provides, among other things, that the funds, credit, property or things of value of the State, or of any political corporation thereof, shall not be loaned, pledged, or granted to or for any person or persons, associations or corporations, public or private.

In Fisher v. Steele, 39 La.Ann. 447, 1 So. 882, this court held that levee districts were not political corporations within the scope of this article of the Constitution.[7] Moreover, by the act quieting title in the Orleans Levee Board the State was not parting with title within the meaning of this constitutional provision, but was only placing the property under the control of one of its agencies for supervision and administration. The land to all practical intents and purposes, is still the property of the State. See State ex rel. Board of Commissioners of Tensas Basin Levee District v. Grace, 161 La. 1039, 109 So. 830.

█ It is next argued that the 1942 act is an attempt by the Legislature to interpret Act 99 of 1924, and that it therefore violates Sections 1 and 2 of Article 2 of our state Constitution because the interpretation of a legislative act is strictly and solely a judicial function.

As we have said, the Legislature in adopting the 1942 act recognized and took cognizance of the provisions of Act 99 of 1924, but the 1942 act is not a legislative interpretation of the 1924 act. The 1942 act stands alone. It confirmed the title of the Orleans Levee Board to all lands in the spillway area. The fact that this act does stand alone is evidenced

7. Art. 56 of the Constitution of 1879.

by the fact that Act 99 of 1924 has been repealed.

It is still further argued that, if the 1942 act should be construed to give effect to the disposition of the lands of Grand Prairie Levee District by Act 99 of 1924, an act which appellees contend is illegal, then the 1942 act violates Article 4, Section 4, of our Constitution, which prohibits the Legislature from enacting any local or special law legalizing the unauthorized or invalid acts of any officer, servant, or agent of the State, or of any parish or municipality thereof.

Although the Legislature treated this statute as a local or special law, we have grave doubt that it is such a law. See Knapp v. Jefferson-Plaquemines Drainage District, 224 La. 105, 68 So.2d 774. Moreover, we have not construed the 1942 act as giving effect to any disposition of Grand Prairie's lands that might have been made in the 1924 act, but have held that the 1942 act, standing alone, confirmed and quieted title in the Orleans Levee Board.

The intervenor, John E. Pottharst, Sr., as the owner of $10,000 of bonds issued by the Grand Prairie Levee District in September, 1938, contends that his bonds are secured by a mortgage on the property here involved, the S ½ of Section 18, T. 18 S., R. 16 E. He argues that, if this court should recognize that Act 311 of 1942 confirmed title to these lands in the Orleans Levee Board, then that act would be unconstitutional, in violation of Article 4, Section 15, of the Louisiana Constitution and Article 1, Section 10, of the United States Constitution, both of which provide that no law impairing the obligation of contracts shall be passed. Appellee Grand Prairie Levee District also makes this same contention.

At the time these bonds were issued in September of 1938, the Grand Prairie Levee District, as we have pointed out, had been recreated, reestablished, and reorganized by the provisions of Act 246 of 1928 in territory below the spillway area and had been divested of all its rights and relieved of all its duties in the area of the spillway. These bonds were issued under the provisions of Sections 12 and 19 of Act 24 of 1898 as amended by the provisions of Act 325 of 1938. Although this 1938 act provides that, when bonds are issued thereunder, the bonds shall be secured by a mortgage on all said levee district lands, this could only mean that these bonds are secured by a mortgage on the property within the confines of the levee district itself as created and defined by the act of 1928. The lands here in question are not in this new levee district, but are located in the spillway area from which Grand Prairie Levee District has been ousted. Consequently Pottharst has no mortgage on these lands for the

payment of the bonds held by him, and his bonds are secured only by mortgage and taxation on all lands owned by the Grand Prairie Levee District as reorganized and reconstituted by the 1928 act. Therefore the 1942 act cannot be said to impair the obligation of the contract under which these bonds were issued.

As we have shown, the royalties stipulated in the Orleans lease are greater than those which are due under the Grand Prairie lease. At the beginning of this concursus Richardson & Bass, operator of Cox Bay Unit No. 2, deposited in the registry of the court a sum sufficient to pay royalties under either lease. Since we have concluded that the Orleans Levee Board is entitled to receive $\frac{1}{8}$ of 55 per cent of the royalties due under the Grand Prairie lease and that Delta Development Company is entitled to receive $\frac{1}{48}$ of 55 per cent of such royalties under its sublease to Richardson & Bass, there will be a surplus in the funds deposited in the registry of the court which should be returned to Richardson & Bass, the operator, in accordance with the prayer of its petition.

Because of the conclusion which we have reached in this case, we have decided to set aside the judgment of the district court and to recast it in its entirety, as follows:

It is now ordered that the judgment appealed from be set aside.

It is ordered that all claims of the Plaquemines Parish Police Jury, as governing authority of Grand Prairie Levee District, to any part of the funds deposited in the registry of the court be denied, as well as its claim to the proceeds of any future royalties from Wells Nos. 4–H, 6–H, 7–H, and 14–H in Cox Bay Unit No. 2.

It is further ordered that the Board of Levee Commissioners of the Orleans Levee District recover $\frac{1}{8}$ of 55 per cent of the proceeds of the oil and gas produced by Richardson & Bass (Louisiana Account) from the four wells designated above; that Delta Development Company, Inc., recover $\frac{1}{48}$ of 55 per cent of the proceeds of the oil and gas produced from these wells; that each be paid so much of the funds deposited in the registry of the court as represents the value of the interest of each, and that after such distribution any surplus remaining in the funds so deposited be returned to Richardson & Bass.

It is further ordered that the intervention of John E. Pottharst, Sr., be dismissed at his costs.

It is ordered that all costs of these proceedings be paid from the fund in the registry of the court to be distributed to Orleans Levee Board and Delta Development Company, Inc., and that these litigants have judgment against Plaquemines Parish Police Jury, as governing authority of Grand Prairie Levee District, and John

E. Pottharst, Sr., for such costs insofar as allowed by law.

The clerk of court is ordered to distribute the funds on deposit in the registry of the court in accordance herewith.

HAMITER, J., dissents with written reasons.

HAMITER, Justice (dissenting).

When the State of Louisiana transferred the land in dispute to the Board of Commissioners of the Grand Prairie Levee District, by a written instrument that was duly recorded in the Conveyance Records of Plaquemines Parish, title thereto was vested absolutely in the transferee. Section 11 of Act 24 of 1898, LSA–R.S. 38:1001; State ex rel. Hodge v. Grace, 191 La. 15, 184 So. 527; Kemper v. Atchafalaya Basin Levee District, 214 La. 383, 37 So.2d 844. This being true, a divestiture of that absolute title could be accomplished by the Legislature only through a statute expressing an intention to that effect which is "clear and unmistakable in its terms, free from and devoid of implication." State ex rel. Hodge v. Grace [191 La. 15, 184 So. 534], supra. And "in the absence of such intention clearly expressed or evidenced therein this court should find that the Legislature had no such intention." Kemper v. Atchafalaya Basin Levee District [214 La. 383, 37 So.2d 846], supra.

The important and primary question to be determined herein, hence, is whether the Legislature has by statute expressed clearly and unmistakably an intention to divest the Grand Prairie Levee District of its absolute title to the disputed property and vest it in the Orleans Levee District.

Contending that this question should be answered in the affirmative, the Orleans Levee District relies on Act No. 99 of 1924, Act No. 246 of 1928, LRS–R.S. 38:991 et seq. and Act No. 311 of 1942. Obviously, the first of these statutes does not support the contention. Therein, nothing is said about *public* lands. The 1924 act authorized the Orleans Levee District "* * * to construct or cause to be constructed on the east bank of the Mississippi River in the Parish of Plaquemines a spill way or waste wier, or other works, so located and designed according to plans and specifications as shall have been approved by the State Board of Engineers and the Mississippi River Commission"; it granted authority for acquiring "* * * by purchase, donation or expropriation *the lands or other property necessary for the construction of such works * * *"; it required such Levee District, "* * * as a condition precedent to removing any levees or taking possession of any property, to acquire by purchase or expropriation and to pay for all lands and property privately owned within the area covered by the proposed*

*plan* from the upper to the lower limits thereof and from the Mississippi River to the sea"; and it directed the State Board of Engineers " * * * to cooperate with the said Board of Levee Commissioners of the Orleans Levee District in the preparation of the necessary plans and the construction of the necessary works, the cost thereof to be paid by the Orleans Levee District". In other words, under the legislation, the State Board of Engineers were to design, locate, and supervise the building of, the spillway, and the Orleans Levee District would finance and cause its construction after acquiring and paying for all needed privately owned lands "within the area covered by the proposed plan" ("area", according to Webster's New International Dictionary, means a particular extent of surface), which plan would involve only the property lying within the spillway's upper and lower limits and within its limits between the Mississippi River and the sea.

Of course, the 1924 act also authorized and directed the Orleans Levee District to assume the entire bonded indebtedness of the Grand Prairie Levee District. However, this is of no significance in determining the primary question under consideration. The assumption was provided for and consummated because at that time, according to the record, the only usable (protected from the gulf's storm waters and high tides) and taxable lands within the Grand Prairie Levee District lay between the then existing front levee and the "back levee"—the area which was to become the Bohemia Spillway; and being thereby deprived of all tax revenues the Grand Prairie Levee District was justly entitled to be relieved of its bonded indebtedness, to the retirement of which such revenues had been pledged.

Incidentally, as the majority opinion correctly points out, the land in dispute herein is not within the spillway. It lies approximately a mile east of the "back levee"—the spillway's eastern or seaward limit.

Neither does the 1928 statute indicate a clear intention of the Legislature to divest the absolute title of Grand Prairie Levee District. Therein, that district's boundaries were redefined; private property which could be taxed was provided for; and to it was conveyed all state owned land in the recreated area. No portion of the act contains words of divestiture or any language indicating that the Orleans Levee District was to be the recipient of lands theretofore conveyed by absolute title to the Grand Prairie Levee District.

With reference to Act 311 of 1942, which is principally relied on by the majority as divesting Grand Prairie Levee District of its absolute title and legislatively vesting it in the Orleans Levee District, Section 1 thereof recites: "Be it en-

acted by the Legislature of Louisiana, That the right, title, ownership and possession of the Board of Levee Commissioners of the Orleans Levee District *to all public lands in the area of the Bohemia Spillway* between Bohemia Plantation, above, and Cuselich Canal, below, and from the river to the sea * * * be now confirmed, quieted and acknowledged, it being recognized that said rights, ownership and possession came into existence when said Orleans Levee Board located and constructed said Bohemia Spillway in the year 1925." (Italics mine.)

I cannot agree that this language discloses a clearly expressed and unmistakable intention of the Legislature to recognize and confirm the Orleans Levee District as the owner of *all public lands in* Plaquemines Parish east of the Mississippi River lying between the river and the sea, including the disputed property which admittedly lies without, and is a mile distant from, the Bohemia Spillway.

In the first place the title to the 1942 act indicates that the public lands intended to be affected were those lying only within the spillway itself—that is, between the front and back levees. It recites: "To confirm and quiet the Board of Levee Commissioners of the Orleans Levee District in the ownership and control of all public lands *in the Bohemia Spillway when it was constructed by said Levee Board in obedience to Act 99 of the Legislature of 1924."* And it may be recalled that the mentioned 1924 act authorized the Orleans Levee Board to acquire land "necessary for the construction of such works" and, in connection therewith, it required such board to pay for all privately owned lands "within the area covered by the proposed plan." (Italics mine.)

In fact, the above quoted Section 1, considered along with the title (consideration of the title is permissible in determining legislative intent if the language of the statute is ambiguous, as here), can well and easily be similarly construed; for it specifically relates "to all public lands in the area of the Bohemia Spillway * * *." True, following the reference to that particular extent of land surface are the words "between Bohemia Plantation, above, and Cuselich Canal, below, and from the river to the sea". But this language could have been used in the sense of merely locating the spillway.

Moreover, it seems to me that if the Legislature had intended to confirm title in the Orleans Levee District to that vast area of land lying between the river and the sea (and by implication, incidentally, to divest Grand Prairie of its absolute title), references to the spillway lands and to Act 99 of 1924 would have been unimportant and unnecessary. The confirmation could have been effectively accomplished by omitting those references entirely.

Again, the sixth and seventh "Whereas" provisions of the 1942 legislation suggest that the confirmation of title was restricted to the spillway property. Thus, the former declared that " * * * the said Orleans Levee Board did in obedience to said act agree to pay and has paid to the Grand Prairie Levee Board and to the East Bank Levee Board the entirety of their outstanding indebtedness * * * and was thereby entitled to and invested with all the rights, title and interest of each of said boards in the *entire area of said spillway where the property was dedicated for said* uses, * * *." And the latter stated: " * * * said former rights of both of said two former levee boards accrued to and became the rights and property of said Orleans Levee Board, save that same were thereafter non-taxable and could not be alienated or sold, as *same were intended for and dedicated to the purposes of said spillway and have been so used* for the past sixteen years by the Orleans Levee Board, * * *." (Italics mine.)

Finally, if the interpretation placed on the 1942 act by the majority be correct (as I understand the majority opinion it holds that the statute granted to the Orleans Levee District title to *all public lands* lying between the Mississippi River and the sea which are situated in the vicinity of the Bohemia Spillway) the Orleans Levee District, as a result of the legislation, now owns (in addition to the spillway land and the property in dispute) countless thousands of acres of land comprising that broad expanse of territory which had formerly belonged to the state and to several of its agencies (including a school district). I can conceive of no good reason for the Legislature making such a grant. Those many thousands of acres of public land (other than the spillway property) had no relationship whatsoever to the construction and operation of the Bohemia Spillway—a project which the legislation in question solely concerned.

My conclusion is, therefore, that the Legislature has not expressed clearly and unmistakably an intention to divest the Grand Prairie Levee District of the disputed property and to transfer it to the Orleans Levee District. Accordingly, I am of the opinion that the judgment of the district court should be affirmed.

I respectfully dissent.

### On Rehearing

McCALEB, Justice.

Following the rendition of our original decision, all litigants adversely affected thereby in any respect, viz.,—Plaquemines Parish Police Jury, as governing authority of Grand Prairie Levee District;

Board of Levee Commissioners of the Orleans Levee District and John E. Pottharst, Sr., timely applied for a rehearing. The application of Plaquemines Parish Police Jury was refused as we were and still are convinced of the correctness of our holding that the title and ownership of the Grand Prairie Levee District to any land embraced in the Bohemia Spillway area was transferred to the Orleans Levee District by Act 311 of 1942 and that this legislative grant invested Orleans Levee Board with legal title " * * without necessity of formal act of conveyance". However, we granted the other applications believing that the claim of Orleans Levee Board, for its $\frac{9}{16}$ths contractual royalty, and that of Pottharst, for asserted recognition of his right of mortgage on the leased land, warranted further consideration.

The case is fully stated in our original opinion and a repetition of the pleadings and facts would be superfluous. Suffice it to say the only issues presently before us are (1) whether Orleans Levee Board is entitled to $\frac{9}{16}$ths or $\frac{9}{48}$ths royalty on production under its lease to Richardson & Bass, dated March 30th 1950, and whether its royalty interest is subject to the $\frac{1}{48}$th overriding royalty of Delta Development Co., Inc., and (2) whether the original decree adversely affected the contractual right of the intervening bondholder, John E. Pottharst, Sr.

In our original opinion, we upheld the validity of the lease granted by Grand Prairie Levee District in favor of Delta Development Co., Inc., in which that District reserved to itself a $\frac{1}{8}$th royalty, forasmuch as Grand Prairie was the record owner of the public lands affected by the lease at the time of its execution on July 20th 1936. We reasoned that, since, by specific provision of Act 311 of 1942, the transfer of title to Orleans Levee Board was subject to the valid leasehold rights previously granted by Grand Prairie, the former merely succeeded to whatever rights the latter possessed under the lease and therefore was entitled to the $\frac{1}{8}$th royalty provided for therein.

Orleans Levee Board contends that it is, nevertheless, entitled to receive the $\frac{9}{16}$ths royalty agreed upon by Richardson & Bass in the lease of March 30th 1950 and it further maintains that this royalty should not be burdened with the $\frac{1}{48}$th overriding royalty reserved by Delta Development Co., Inc. in its sublease to Richardson & Bass, dated December 27th 1950, for the reason that the 1936 lease executed by Grand Prairie Levee District is invalid.

In assailing the legality of the 1936 lease, counsel for Orleans Levee Board do not contend that it terminated or was forfeited because of non-production or failure to pay delay rentals or for any de-

fect of form in confection.[1] They merely reiterate the argument advanced by them on original hearing that Grand Prairie was completely divested of title to the property affected by the lease by Act 99 of 1924 or, in any case, by Act 246 of 1928.

Because of the earnestness of counsel, we have reconsidered our original views and, as we have above indicated, entertain no doubt as to the soundness of our ruling that Orleans Levee Board did not acquire title to the lands situated in the Bohemia Spillway area before the effective date of Act 311 of 1942. Prior to that legislative grant, Grand Prairie Levee District unquestionably had a clear title to the land covered by the mineral leases involved herein which had been duly recorded in the conveyance records of Plaquemines Parish. See Section 11 of Act 24 of 1898; State ex rel. Hodge v. Grace, 191 La. 15, 184 So. 527 and Kemper v. Atchafalaya Basin Levee District, 214 La. 383, 37 So.2d 844.

Act 99 of 1924, under which the construction of the Bohemia Spillway was authorized, did not divest Grand Prairie Levee District of its prior ownership of lands within that area. Nor was a divestiture of title effected by Act 246 of 1928. That Act redefined the boundaries and jurisdiction of Grand Prairie and there is nothing in the statute indicating that Orleans Levee District was to or did acquire ownership of any of the lands then owned by Grand Prairie which were situated within the area of the Bohemia Spillway.

Furthermore, Act 311 of 1942, despite its multifarious and inept use of the words "confirmed", "quieted" and "acknowledged" in describing the grant and transfer of title of the public lands in the Bohemia Spillway area to Orleans Levee Board, affirmatively recognized that Grand Prairie Levee District was the immediate holder of the legal and existing title thereto for the grant to Orleans is made "* * * subject to *whatever valid leasehold rights* as may have been granted by the Grand Prairie Levee District on lands previously granted and conveyed to it, *prior to the passage of this Act, * * *"*. (Italics ours.) Hence,

---

1. The record shows that the July 20th 1936 lease of Grand Prairie Levee District to Delta Development Co., Inc. covered a large acreage and included all of the lands owned by Grand Prairie in the Levee District. Subsequently, Delta Development Co., Inc. subleased a portion of the property covered by the lease to Gulf Refining Company and the latter commenced drilling operations in 1938 which were apparently successful.

In January of 1950, Delta Development Co., Inc. filed suit against the Plaquemines Parish Police Jury, the governing body of Grand Prairie Levee District, and a judgment was rendered by the 25th Judicial District Court decreeing that Delta's lease of July 20th 1936 was still in full force and effect since production of oil in paying quantities had been maintained from July 10th 1938.

in keeping with this provision, it is manifest that the title of Orleans Levee Board was burdened with the leasehold rights which had been granted by Grand Prairie in favor of Delta Development Co., Inc.

On the other hand, our present view is somewhat different from that previously announced in respect to the royalty percentage which Orleans Levee Board is to receive. We originally concluded that, in view of the validity of the 1936 lease, Orleans Levee Board, by its acquisition of title in 1942, merely stepped into the shoes of Grand Prairie and was entitled to no more than the ⅛th royalty which would have been recoverable by Grand Prairie under that lease.

We are now of the opinion that, as Orleans Levee Board became the owner of the land in 1942, it had the right to lease it in 1950 to Richardson & Bass, such lease being burdened by "whatever valid leasehold rights" Delta Development Co., Inc. had acquired under the 1936 lease. However, since Orleans Levee Board's lessee, Richardson & Bass, subsequently acquired all of Delta's leasehold rights under the 1936 lease, save the reservation by Delta of a ⅟₄₈th overriding royalty, the latter is the only valid outstanding leasehold right to which Orleans Levee Board

is subjected. Richardson & Bass, the plaintiff herein, could not and does not question in this concursus proceeding the validity of the 1950 lease granted it by Orleans Levee Board. Nor does it claim that the Levee Board has not performed and is not now fulfilling all of the obligations required of it under that lease.[2] In these circumstances, there being no other valid outstanding leasehold right, Orleans Levee Board is entitled to receive its contractual ³⁄₁₆ths royalty, subject to the ⅟₄₈th overriding royalty of Delta Development Co., Inc., or a net royalty of ⁸⁄₄₈ths.

It remains only to consider the claim of the intervenor, John E. Pottharst, Sr. He alleges, in substance, that he is the owner of $10,000 worth of bonds which are part of a total $50,000 issue of Grand Prairie Levee District authorized by Act 325 of 1938; that the principal and interest of these bonds are payable out of the funds derived from the collection of taxes and revenue of Grand Prairie Levee District and that, as provided in the statute, "the same shall operate as a mortgage on all of said Levee District lands until the final payment of said bonds in principal and in interest". He further alleges that the 1936 mineral lease between Grand Prairie and Delta Development Co., Inc. was of

2. In any case, Richardson & Bass, being a tenant in possession, is in no position to assert leasehold rights adverse to that of its lessor, Orleans Levee Board. Weil v. Segura, 178 La. 421, 151 So. 639 and Sabine Lumber Co. v. Broderick, 5 Cir., 88 F.2d 586.

record at the time the bonds were issued; that all of the income and revenue derived by Grand Prairie from the mineral lease are part of the security for the payment of the principal and interest of the bonds and that any diversion of the revenues therefrom to Orleans Levee Board would constitute an impairment of the contract under which the bonds were issued in violation of Section 15 of Article 4 of the Louisiana Constitution and of Section 10 of Article I of the Constitution of the United States. He prays that he be allowed to intervene in the proceeding, aligned with Plaquemines Parish Police Jury, as governing body of Grand Prairie Levee District and that, in due course, the latter be recognized as owner of the lands covering the mineral leases herein and entitled as such to all income and the revenue accruing under the 1936 mineral lease.

In our original opinion, we rejected the intervention on the ground that the bonds issued by the Grand Prairie Levee District in 1938 did not operate as a mortgage on the land covered by the mineral leases herein in view of the reestablishment and reorganization of the Grand Prairie Levee District by Act 246 of 1928 in territory below the Bohemia Spillway area and that a fair construction of Act 325 of 1938, providing that the bonds issued by Grand Prairie Levee District shall be secured by a mortgage on all said

Levee District lands, meant that these bonds were secured only by a mortgage on the property situated within the confines of the Levee District as reestablished by Act 246 of 1928.

Being doubtful of the correctness of this ruling, we granted intervenor a rehearing on his argument that he is entitled to have it recognized that his bonds are secured by a mortgage on the land under lease. However, as will be seen from the statement of intervenor's pleadings, it does not appear that he is seeking the relief demanded in this Court. He makes no claim therein that his bonds are in default or that his rights as mortgagee of the land might be impaired by the outcome of this litigation or even that the issues in this case necessarily require that a determination be made of whether the transfer of the ownership of the lands in the Bohemia Spillway area from Grand Prairie to Orleans Levee Board by the 1942 Act impaired the security given him by law. Actually, his only plea is that Grand Prairie is entitled to be recognized as owner of a ⅛th royalty interest in all production from the 1936 mineral lease and that, unless this is adjudged, the security of his bonds will be unconstitutionally diminished because Act 325 of 1938 provides that the bonds issued thereunder shall be secured, among other things, by the revenues and income of all lands owned by Grand Prairie Levee District.

Obviously, this provision relative to the bondholder's security in revenues from lands is applicable only to the mortgaged lands while they are owned by the Levee District. Grand Prairie had long since been divested of the land subject to the leases herein when production was obtained by Richardson & Bass and therefore none of the revenue derived therefrom belongs to Grand Prairie or is subject to the payment of the bonds which are not even alleged to be in default. Accordingly, as the case merely involves the recognition of ownership of certain oil production, there is no necessity and really no issue for determination respecting the rights of a bondholder of Grand Prairie Levee District to have recognition of his mortgage and any opinion expressed by us in this proceeding would be purely advisory. Since the intervention could only be considered on the basis that the bondholder had an interest in maintaining Grand Prairie's position, the rejection of that Levee District's claim operates as ground for its dismissal.

For the foregoing reasons, the third paragraph of our original decree is amended so as to read as follow:

It is further ordered that the Board of Levee Commissioners of the Orleans Levee District recover ⅜ths of 55 per cent of the proceeds of the oil and gas produced by Richardson & Bass (Louisiana Account) from the four wells designated as Wells Nos. 4–H, 6–H, 7–H and 14–H in Cox Bay Unit No. 2; that Delta Development Company, Inc. recover ⅛th of 55 per cent of the proceeds of the oil and gas produced from these wells and that each be paid so much of the funds deposited in the Registry of the Court as represents the value of these designated interests.

As thus amended, the original decree herein is reinstated as the judgment of this Court. The Board of Levee Commissioners of the Orleans Levee District is reserved the right to apply for a second rehearing.[3]

HAWTHORNE, J., concurs in part and dissents in part.

HAMITER, J., concurs in part and dissents in part with written reason.

HAMITER, Justice (concurring in part and dissenting in part).

I concur in the conclusion that Delta Development Company, Inc. obtained a good and valid lease from Grand Prairie Levee District and that it presently owns a ⅛th overriding royalty by virtue of a

---

3. The reason for this is that some of the members of the Court, after a careful examination of the record, entertain doubt as to the validity of the leasehold rights claimed by Delta Development Co., Inc.

reservation in its sublease to Richardson and Bass. Otherwise, I dissent, adhering to the views which I expressed on the original hearing of the cause.

## On Rehearing

HAWTHORNE, Justice (dissenting in part).

I dissent only from that portion of the majority opinion on rehearing which awards to Orleans Levee Destrict $\frac{9}{16}$ ($\frac{9}{48}$) of 55 per cent of the proceeds from these wells minus $\frac{1}{48}$ overriding royalty to Delta Development Company. It is my view that the award to Orleans and Delta as made in the opinion on original hearing is correct.

## On Second Rehearing

SIMON, Justice.

On rendering our opinion on rehearing, some of the members of the court having entertained serious doubt as to the validity of the leasehold rights claimed by Delta Development Co., Inc. (hereinafter referred to as "Delta"), we reserved the right to the Board of Levee Commissioners of the Orleans Levee District (hereinafter referred to as "Orleans Levee Board") to apply for a second rehearing, which presents again that feature of the case for our consideration.

All of the facts of this concursus proceeding are correctly and succinctly stated in our original opinion, thus dispensing with the necessity of repetition.

In our original decree, besides other dispositions not pertinent to the issue here involved, we held that the Orleans Levee Board was entitled to recover a $\frac{1}{8}$th of 55% of the proceeds of the oil and gas produced by Richardson & Bass from the four wells designated in this controversy; and that Delta was entitled to recover $\frac{1}{48}$th of 55% of said proceeds.

On first rehearing, in addition to the issue presented by intervenor, John E. Pottharst, Sr., which is not here under consideration, we considered whether Orleans Levee Board was entitled under its mineral lease of March 30, 1950, in favor of Richardson & Bass, to recover $\frac{9}{16}$ths or $\frac{9}{48}$ths of the royalty proceeds of the oil and gas produced by Richardson & Bass, and whether said royalty interest was subject to the $\frac{1}{48}$th overriding royalty claimed by Delta. We held that Orleans Levee Board was entitled to recover $\frac{9}{48}$ths of 55% of said proceeds and that Delta was entitled to recover $\frac{1}{48}$th thereof. As thus amended our original decree was reinstated.

In this second rehearing, Orleans Levee Board contends (a) that Delta did not acquire valid leasehold rights under its purported mineral lease from the Grand Prairie Levee District (hereinafter referred to as "Grand Prairie") dated July

20, 1936, Grand Prairie not having right, title or interest in or to or jurisdiction over the land so leased; and (b) that Richardson & Bass has a contractual obligation to pay to Orleans Levee Board, under the reservation made in its mineral lease dated March 30, 1950, in favor of Richardson & Bass, a 3/16ths royalty, irrespective of any alleged obligation to pay the overriding royalty of 1/48th claimed by Delta.

Therefore, the sole and singular issue to be resolved, shorn of all irrelevant tangibles, is whether on July 20, 1936, Grand Prairie had the legal right to execute and grant a mineral lease covering the land involved in this controversy and by said act thereby effect and constitute an outstanding valid leasehold right.

The mineral lease executed by Grand Prairie in favor of Delta, dated July 20, 1936 and recorded July 25, 1936, had a primary term of five years and covered an area in excess of 10,000 acres, for a cash bonus consideration of $300. It described the lands as being all of the lands of Grand Prairie acquired by it from the State by act of conveyance dated January 18, 1905, registered in Conveyance Office Book 39, Folio 105 of the public records of Plaquemines Parish, except those lands which had been sold by Grand Prairie, and all lands owned by Grand Prairie on which it has any rights or interest, or may acquire under Acts 24 of 1898, 27 of

1904 and 246 of 1928, from the east bank of the Mississippi River to the rear boundary of this Levee District, all lying and being in T. 18 S., Rs. 16, 17 and 18 E.; T. 19 S., Rs. 16, 17, 18, 19 and 20 E.; T. 20 S., Rs. 18, 19 and 20 E.; and T. 21 S., Rs. 18 and 19 E.

Grand Prairie was originally created by Act 24 of 1898. Its territorial boundaries defined therein included all lands contained within the Parish of Plaquemines on the left or east bank of the Mississippi River, beginning at the lower line of Bohemia Plantation and extending southward to the upper line of the U. S. Reservation for Fort St. Philip. Under section 11 of said act after the recordation of the conveyances of land by the State Land Office on behalf of and in the name of the State to the Board of Levee Commissioners of the Grand Prairie Levee District, as provided therein, the title to said lands, with the possession thereof, became vested absolutely in said Board of Levee Commissioners, its successors or grantees, as long as said lands remained in the possession or under the control of said Board.

Act 24 of 1898 was amended by Act 43 of 1900, extending the lower limit of Grand Prairie from the upper line of the U. S. Reservation for Fort St. Philip to the lower line of Baptist Collette's Gap and granting to Grand Prairie territorial jurisdiction over all lands embraced within

its limits as extended. This territorial jurisdiction, as extended, was confirmed by Act 27 of 1904.

As an emergency measure and in order to grant adequate protection from the danger of floodwaters of the Mississippi River to the City of New Orleans, by Act 99 of 1924 the Legislature authorized the Orleans Levee Board to construct or cause to be constructed a spillway or waste weir or other works on the east bank of the Mississippi River in the Parish of Plaquemines, located and designed according to plans and specifications approved by the State Board of Engineers and the Mississippi River Commission. To this end the Orleans Levee Board was authorized to acquire by purchase, donation or expropriation lands or other property necessary for the construction of said works and to receive and expend therefor any funds contributed by the U. S. Government or any levee district of the State benefited by said works. The Legislature further authorized the Orleans Levee Board to pay the purchase price or award necessary for the expropriation or acquisition of lands and property privately owned within the area covered by the proposed plan from the upper to the lower limits thereof and from the Mississippi River to the sea; to arrange with the Board of Levee Commissioners of the Grand Prairie whereby the bonded and other indebtedness of said Levee District, as to the area to be affected by the proposed spillway, would be ac-

quired and paid by said Orleans Levee Board, at values as of June 17, 1924, and evidence of said indebtedness cancelled; that upon completion of the said spillway to consent to the removal at the expense of the Orleans Levee Board of all of the levee systems of said district located within the said spillway and as may be determined by the Orleans Levee Board shall be removed; to levy annually, for such period of time as it may determine, such taxes as may be required for the construction of said spillway.

Pursuant to the authority of this act and in accordance with the plans and specifications designed and approved by the State Board of Engineers and the Mississippi River Commission, the Orleans Levee Board constructed said spillway and which is commonly known as the Bohemia Spillway. The design, plans and specifications defining the limits of said Bohemia Spillway conclusively show that the upper boundary of said spillway is the southern boundary of Bohemia Plantation, and the lower boundary of said spillway is the northern line of the Cuselich Canal, its western boundary the east bank of the Mississippi River, and its eastern extremity extending to the sea. In connection with this project, levees were built paralleling the northern and southern boundaries of the spillway. A small weir levee was constructed 2500 to 3000 feet to the rear of the east bank of the Mississippi River.

All survey maps and plats and public documents, including acts of the Legislature, unmistakably show that the property involved in this controversy is located well within the territorial limits of said spillway, notwithstanding that in our original opinion we observed in Note 3 that said lands are not within its confines.

Although Grand Prairie was originally created and its territorial limits defined by Act 24 of 1898, it was re-created and re-established by Act 246 of 1928. Section 1 of the latter act, after defining the territorial limits of Grand Prairie, declared that all lands embraced within said limits *"shall constitute a Levee District to be known and styled the 'Grand Prairie Levee District'"*. (Italics ours.) Its territorial limits were defined as being the area contained within the Parish of Plaquemines, on the left or east bank of the Mississippi River, beginning at the lower side of the Cuselich Canal at Ostrica and extending to the upper side line of Cupid's Gap and main pass and including all lands within said limits. As in the original act creating the Grand Prairie, the Legislature embodied in the Act of 1928 the same provision as to title, right and jurisdiction while said lands remained in the possession and under the control of the Board of Commissioners of the Grand Prairie Levee District.

It is inescapable that in re-creating and re-establishing Grand Prairie and defining its territorial limits, in the exercise of its inherent power, the Legislature excluded and ousted the Grand Prairie from exercising jurisdiction over any lands not included within said territorial limits and divested it of all its corresponding powers, rights, titles and interest in, to and over the lands embraced within the confines of the Bohemia Spillway.

Under Act 24 of 1898, the Board of Commissioners of the Grand Prairie Levee District enjoyed the authority and right to contract for the sale, mortgage, pledge or other disposition of the lands within its then-existing jurisdiction. As a result of its re-creation and re-establishment by Act 246 of 1928, the Grand Prairie was granted identical rights and jurisdiction over the territorial limits therein defined, but of necessity said rights and jurisdiction were limited thereto.

Thus we adhere to our holding in our original opinion that this 1928 Act, re-creating and re-establishing the Grand Prairie Levee District in territory below the spillway area, divested it of all rights and relieved it of all duties in the area of the spillway which it had enjoyed under the provisions of Act 24 of 1898.

It is undisputed that the construction of the Bohemia Spillway proposed by Act 99 of 1924 became a *fait accompli* in 1926. Upon its completion it became public property, dedicated to meet the public emergency which prompted the adoption of Act 99 of 1924, with fixed and well-defined

boundaries, embracing not only a portion of lands previously owned by Grand Prairie but also a portion of lands previously owned and controlled by the Plaquemines Parish East Bank Levee District.

The case of Emery v. Orleans Levee Board, 207 La. 386, 21 So.2d 418, 421, involved a petitory action affecting certain land located within the boundaries of the Bohemia Spillway. Plaintiffs obtained a certificate of redemption covering the property which had been sold in 1922 and brought suit against the Orleans Levee Board to have said certificate of redemption and ownership recognized. Taking cognizance of the statute authorizing the construction of the Bohemia Spillway, we said:

"From our appreciation of the provisions of Act 99 of 1924, the Legislature intended for the lands embraced in the spillway to be set aside and removed from commerce.

"The act provides for the acquisition of the fee title of the lands embraced in the spillway * * *."

In the Emery case we recognized that the lands located within said spillway were dedicated to public use; that there is no sacramental form to be followed in dedicating property to public use, LaSalle Realty Co. of Louisiana, Inc. v. City of New Orleans, 169 La. 1035, 126 So. 545; that a statutory dedication is generally indicated by the statute itself and there need not be a special grant as is required in common law dedications, Arkansas-Louisiana Gas Co. v. Parker Oil Co., 190 La. 957, 183 So. 229; City of Shreveport v. Drouin, 41 La.Ann. 867, 6 So. 656; Brasseaux v. Ducote, La.App., 6 So.2d 769; Ford v. City of Shreveport, 204 La. 618, 16 So.2d 127; and that such property is out of commerce, held as a special trust for public uses and is inalienable by corporations, City of New Orleans v. Carrollton Land Co., 131 La. 1092, 60 So. 695. We concluded that since said lands had been thus dedicated to public use several years prior to the certificate of redemption and ownership the plaintiffs had no rights of ownership therein.

Undoubtedly, once the lands embraced within the confines of the Bohemia Spillway became dedicated to public use and governmental functions and upon its completion in 1926, such dedication instigated and became the mainspring for the adoption of Act 246 of 1928 which re-created and re-established the Grand Prairie Levee District, ousting the latter from all jurisdiction, rights and privileges whatsoever over the lands located in the Bohemia Spillway.

Both the Orleans Levee Board and the Grand Prairie are creatures or agencies of the State, and, as to such agencies, it is the inherent right of the State to abrogate, rescind and nullify any grant of title to land made by it to one of the districts and

to vest complete title thereto in the other. The State, having dedicated the lands located in the Bohemia Spillway for public uses by Act 99 of 1924, vesting control, possession and ownership thereof for governmental functions in the Orleans Levee Board, under the plain and unambiguous provisions of Act 246 of 1928, Grand Prairie was without legal right or authority to execute any contract or grant any valid leasehold right affecting said lands, such as the mineral lease granted in favor of Delta.

Delta strenuously contends that Act 311 of 1942 is an original legislative grant and conveyance of title to the lands confined in the Bohemia Spillway to the Orleans Levee Board and that not until the enactment of this statute was Grand Prairie divested of rights of ownership and control over said lands. This contention is untenable.

Act 311 of 1942 is an act "To confirm and quiet the Board of Levee Commissioners of the Orleans Levee District in the ownership and control of all public lands in the Bohemia Spillway when it was constructed by said Levee Board in obedience to Act 99 of the Legislature of 1924."

In the preamble of said statute the Legislature took cognizance of the fact that Act 99 of 1924 authorized the location and construction of the Bohemia Spillway in the Grand Prairie and East Bank Levee districts; that the location of said spillway and the public works constructed therein included the entire area from the lower line of Bohemia Plantation to the upper line of the Cuselich Canal, embracing all the lands in those limits between the Mississippi River and the sea; that the Orleans Levee Board had paid to Grand Prairie the entirety of its outstanding indebtedness affecting the lands within said spillway, and thereby the Grand Prairie had been removed and ousted therefrom and the Orleans Levee Board entitled to and invested with all rights, title and interest of Grand Prairie.

Therefore, by section 1 of Act 311 of 1942, the Legislature declared:

"That the right, title, ownership and possession of the Board of Levee Commissioners of the Orleans Levee District to all public lands in the area of the Bohemia Spillway between Bohemia Plantation, above, and Cuselich Canal, below, and from the river to the sea subject to whatever valid leasehold rights as may have been granted by the Grand Prairie Levee District on lands previously granted and conveyed to it, prior to the passage of this Act, be now confirmed, quieted and acknowledged, it being recognized that said rights, ownership and possession came into existence when said Orleans Levee Board located and constructed said Bohemia Spillway in the year 1925."

In language unambiguous, clear and not susceptible to judicial interpretation, the Legislature recognized the *rights, ownership and possession* of Orleans Levee Board as having existed from the date of the construction of the spillway in 1925. Thus, Act 311 of 1942 merely confirms, quiets and acknowledges that which previously existed. In the use of the positive words "confirmation", "quieted" and "acknowledged" the Legislature deliberately gave approbation and assent to an estate already created, and its confirmation does not in itself create the estate, but makes firm and gives a new assurance of truth and certainty to an existing situation.

These words naturally import a pre-existing title, which in the instant case relates back to the year 1925; and the act of confirmation only becomes conclusive evidence of that which it concedes existed before.

Delta can find no judicial comfort in the provision of this act confirming the title of Orleans Levee Board subject " * * * to whatever valid leasehold rights as may have been granted by the Grand Prairie Levee District on lands previously granted and conveyed to it * * *."

The mineral lease of 1936, executed by Grand Prairie to Delta was made with knowledge on the part of both parties of the provisions of Act 99 of 1924, and more particularly Act 246 of 1928. It cannot be

said that Delta lacked knowledge of the provisions of Act 246 of 1928, for in the mineral lease itself specific reference is made thereto.

Contracting parties must take notice of the public laws by which they are governed, and hence all persons interested in transactions made pursuant to public statute are chargeable with notice of all that the law contains. The parties to this mineral lease were bound by the laws of the State, and the validity of all negotiations involving State lands is subject to and controlled by said laws.

It is axiomatic that subdivisions of the State are creatures of the Legislature, the fountainhead of their rights, powers and jurisdiction finding source in the express legislative will. Persons negotiating with such agencies or subdivisions do so charged with knowledge of not only the laws of the State affecting said agencies but that the validity of their acts are subject to those laws. Consequently, one contracting in respect to public property must determine for himself that the agency representing the State has authority to deal in respect thereto, being charged with knowledge of the duty of fully ascertaining all laws affecting the property involved as well as the said agency.

In line with these academic fundamentals, it was the duty of Delta to fully

determine the rights of Grand Prairie in and to the lands which it sought to lease and to ascertain the extent of the rights of ownership, if any, in said lands at the time of its negotiation. In failing to discharge this obligation, Delta acted at its own peril.

In seeking to buttress the validity of its mineral lease, Delta relies upon the suit filed by it on January 10, 1950, against the Plaquemines Parish Police Jury and Grand Prairie Levee District, bearing Docket No. 2591 of the Twenty-fifth Judicial District Court for the Parish of Plaquemines, wherein a declaratory judgment was rendered recognizing the mineral lease of July 20, 1936, as being a valid and existing lease as to all of the lands described in or included under said lease. No appeal was taken from the judgment so rendered.

It is not clear to us whether in provoking this proceeding Delta and Grand Prairie entertained serious doubt as to the validity of this mineral lease or what was the nature of their purpose in seeking a declaratory judgment relative thereto.

Be that as it may, the Orleans Levee Board was not made a party defendant in said suit, nor did it have any knowledge or notice thereof, actual or constructive. As the dedicated owner of said lands within the Bohemia Spillway, the Orleans Levee Board was a necessary and indispensable party defendant in such proceedings. Therefore, the judgment is fatal as to it and can have no legal effect upon said Board.

For the foregoing reasons, our decree as finally expressed in our opinion on first rehearing is hereby amended so as to read as follows:

It is further ordered that the Board of Commissioners of the Orleans Levee District recover ⅜₆ths or ⁹⁄₄₈ths of 55% of the proceeds of the oil and gas produced by Richardson & Bass (Louisiana Account) from the four wells designated as Wells No. 4-H, 6-H, 7-H and 14-H in Cox Bay Unit No. 2; and that the claim of Delta Development Co., Inc., for the recovery of a ¼₈th of 55% of the proceeds of the oil and gas produced from these wells, be, and the same is hereby dismissed.

It is further ordered that the Board of Commissioners of the Orleans Levee District be paid its ⅜₆ths or ⁹⁄₄₈ths of 55% of the funds deposited in the registry of the court as representing the value of its interest.

As thus amended, the original decree herein and the decree on first rehearing are reinstated as the judgment of this court.

HAMITER, J., dissents, adhering to his previously assigned written reasons.

HAWTHORNE, J., dissents.

McCALEB, J., dissents with written reasons.

McCALEB, Justice (dissenting).

I adhere to the views expressed in the original opinion, which were affirmed on the first rehearing, that Orleans Levee Board did not acquire title to the land in contest prior to the effective date of Act 311 of 1942.

Therefore, since Grand Prairie Levee District was the legal owner of the property prior to 1942, the lease it granted to Delta Development Company, Inc., is valid and the ownership of Orleans Levee Board is burdened therewith as specifically provided by Act 311 of 1942 under which Orleans Levee Board acquired title to the property.

I respectfully dissent.

HAWTHORNE, Justice (dissenting).

I am still of the view that the award to Orleans and Delta as made in the opinion on original hearing is correct.

On Amendment of Second Rehearing

PER CURIAM.

Our attention is directed to an inadvertent error contained in our decree delivered on November 5, 1956, which, how-

ever, in no wise affects the meaning or intent of our opinion. Nevertheless, we take cognizance thereof and summarily correct said error in order that our judgment may effect a correct distribution of the funds and moneys on deposit in the registry of the Twenty-fifth Judicial District Court, Plaquemines Parish.

The inadvertent errors contained in said decree are as follows:

(a) Paragraph 1 of the decree refers to 4 wells designated as wells 4-H, 6-H, 7-H and 14-H in Cox Bay Unit No. 2, whereas by stipulation signed by all counsel and filed in the record there were six wells which are designated as wells 4-H, 6-H, 7-H, 14-H, 44-H and 47-H in Cox Bay Unit No. 2;

(b) That the second paragraph provides for the payment to petitioner of $\frac{3}{16}$ths or $\frac{9}{48}$ths of 55% of the funds deposited in the registry of the court, whereas the record reveals that the funds deposited in the registry of the 25th Judicial District Court represents $\frac{3}{16}$ths or $\frac{9}{48}$ths of 55% of the proceeds of the oil and gas produced from the six wells as aforesaid, and that consequently petitioner is entitled to be paid the entire amount deposited in the registry of the court.

Therefore, under our supervisory powers this PER CURIAM is issued to correct the said two afore-mentioned errors and to cause our decree to read as follows:

It is further ordered that the Board of Commissioners of the Orleans Levee District recover ⅜₆ths or ⁹⁄₄₈ths of 55% of the proceeds of the oil and gas produced by Richardson & Bass (Louisiana Account) from the six wells designated as Wells No. 4–H, 6–H, 7–H, 14–H, 44–H and 47–H in Cox Bay Unit No. 2; and that the claim of Delta Development Co., Inc., for the recovery of a ⅛₈th of 55% of the proceeds of the oil and gas produced from these wells, be, and the same is hereby dismissed.

It is further ordered that the Board of Commissioners of the Orleans Levee District be paid the entire amount of the funds deposited in the registry of the court as representing ⅜₆ths or ⁹⁄₄₈ths of 55% of the proceeds of the oil and gas produced from the said wells.

As thus amended, the original decree herein and the decree on first rehearing are reinstated as the judgment of this Court.

HAMITER, J., does not participate, having heretofore dissented.

McCALEB, J., not having subscribed to the decree on second rehearing, takes no part in its correction for alleged inadvertent errors.

HAWTHORNE, J. Since I do not subscribe to the decree rendered on second rehearing, I do not participate in this correction.