456 So.2d 605 (1984)
STATE of Louisiana ex rel. William J. GUSTE, Jr., Attorney General, The Department of Natural Resources and the State Mineral Board
v.
BOARD OF COMMISSIONERS OF the ORLEANS LEVEE DISTRICT.
No. 84-C-0312.
Supreme Court of Louisiana.
September 10, 1984.
Rehearing Denied October 4, 1984.
*607 William J. Guste, Jr., Atty. Gen., Gary L. Keyser, David C. Kimmel, Michael O. Hesse, Robert H. Carpenter, Asst. Attys. Gen., for applicants-plaintiffs.
Richard J. McGinity, Baldwin & Haspel, Wilson S. Shirley, Jr., Lawrence K. Benson, Jr., David N. Schell, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, for respondent-defendant.
DIXON, Chief Justice.
The State of Louisiana seeks a judgment declaring it the owner of those portions of the bed and bottom of Lake Pontchartrain situated in Orleans Parish which have not been reclaimed by projects of the Orleans Parish Levee Board. In addition, the state seeks a judgment declaring it the owner of mineral rights to those areas which have been reclaimed. The levee board answers and seeks a judgment declaring it the owner of all lands and lake bottoms within its jurisdiction. The levee board's jurisdiction (and the area in dispute in this case) is between the western boundary of Orleans Parish (West End) and the line separating Township 11 South, Range 12 East, from Township 11 South, Range 13 East (near Paris Road), out to a distance of three miles from the 1918 shoreline of Lake Pontchartrain.
The trial judge declared the state owner of those areas which had not been reclaimed by the board and recognized the state's mineral rights to such areas. He declared the board owner of the mineral rights to those areas which had been reclaimed and remain under control of the board. The Court of Appeal reversed and declared the levee board owner of the entire three mile area. 444 So.2d 1313 (La. App.1984). Upon application of the state, we granted writs. 446 So.2d 1217 (La. 1984). We reverse and reinstate the judgment of the trial court.
The parties have stipulated to the correctness of a map which is a part of the record. The map delineates the 1918 shoreline, the extent of the area reclaimed, and the areas of the lake which were dredged in order to create the fill used in the reclamation projects. These projects resulted in the creation of the lakefront area from West End to the Industrial Canal. The shoreline east of the Industrial Canal, except for the Lakefront Airport and Lincoln Beach, is the same as it was in 1918.
The source of the dispute lies in the language of the grant of authority from the state to the levee board over the three mile area. This authority began as an amendment to the 1913 Constitution which was approved by the people in 1916. See Acts 1916, No. 203. This amendment was then carried forward as Art. 16, § 7 of the 1921 Constitution. The levee board was given the power to "construct and maintain levees ... along, over and in the bed of Lake Pontchartrain at such distance from *608 the present shoreline ... not to exceed twenty-five hundred feet." La. Const. of 1921, Art. 16, § 7(a). The board was also given a right of way over any public land, including the bottom of the lake, which the board deemed necessary to carry out its purposes. La. Const. of 1921, Art. 16, § 7(b).
In 1922, the people adopted an amendment to this section. See Acts 1922, No. 106. The power of the board was enlarged to include construction of "seawalls, jetties, and other works," but the twenty-five hundred foot restriction was continued. La. Const. of 1921, Art. 16, § 7(a) (1922). In addition to the right of way over public land previously granted, the provision also granted the board title to all lands within any "levees, embankments, retaining walls and sea walls" constructed by the Board. La. Const. of 1921, Art. 16, § 7(b) (1922).
In 1928, the people again adopted an amendment to this section. The power of the board was expanded to include the right to locate and relocate improvements, to construct breakwaters and water basins, and to carry out dredging operations. Additionally, the territorial limits of the board's power to conduct such operations were enlarged to include an area three miles from the shoreline (as opposed to the previous twenty-five hundred foot limitation). La. Const. of 1921, Art. 16, § 7(a) (1928). The amendment gave the board title to public things "within the area of the said works of reclamation and improvement." Id. § 7(e). The language granting a right of way was removed, and the board was given title to all public property necessary for the board's purposes, to all lands reclaimed or filled in, and "in and to all lands lying within the territorial limits of said project." Id. § 7(h). The board was given the power to sell or lease any such lands reclaimed; however, the board and the state were prohibited from reclaiming any more land or constructing any other works beyond a "front line of development," once such a line was established by the board's reclamation activities. Id.
Pursuant to La. Const. Art. 14, § 16(A)(12) (1974), these provisions, renumbered in statutory form and with stylistic changes, were transferred to the Revised Statutes dealing with the Orleans Levee Board (R.S. 38:1231-48). See Acts 1975, No. 729. The former constitutional provisions were inserted as R.S. 38:1235.1 to 1235.3. The relevant provisions to this dispute are therefore contained today in the Revised Statutes and are subject to change by legislative action. (Words in brackets indicate language in the 1928 amendment).
Section 1235.1(A) provides:
"... The board shall have full and exclusive right, jurisdiction, power, and authority to locate, relocate, construct, maintain, extend, and improve levees, embankments, seawalls, jetties, breakwaters, water-basins, and other works in relation to [this project] such projects, and to conduct all dredging operations necessary in connection therewith or incidental thereto, along, over, and on the shores, bottom, and bed of Lake Pontchartrain in the parish of Orleans from its western boundary to the boundary line separating township 11 south, range 12 east, from township 11 south, range 13 east, at a distance not to exceed three miles from the present shore line, as the board may determine, ..."
Section 1235.1(F) provides:
"All property owned by the state or the title to which is in the name of the state, and all property which by its nature, situation, and location is not susceptible of private ownership under the present laws and constitution of the state, and within the area of the [said] works of reclamation and improvement, is specifically vested in the levee board."
Section 1235.2(A) (entitled "State land grants") provides:
"To enable the board to perform the work herein provided for, to assist in defraying the cost and expenses thereof, and to carry out the purposes of this and other laws, the state of Louisiana hereby grants and releases to the board the title of the state in and to all public property *609 necessary for the purposes hereof and all lands reclaimed or filled in within any levee embankments, slopes, retaining walls, seawalls, and breakwaters constructed hereunder and in and to all lands lying within the territorial limits of [said] a project...."
Section 1235.2(B) provides:
"... However, when the board has established and located the front line of the development in the bed of Lake Pontchartrain... and has sold, leased, or otherwise disposed of any land or granted any rights based upon the line or location, or when any party, for a valuable consideration, has acquired rights based upon the line or location, then no further reclamation shall be made or other works constructed by the board beyond the established front line or location in the bed of the lake ..."
What these provisions mean with respect to the issues presented can be said, in the words of Civil Code article 16, to be "dubious." In such a case, "their meaning may be sought by examining the context with which the ambiguous words, phrases and sentences may be compared, in order to ascertain their true meaning."[1] Id. In addition, a court should consider the reason and spirit of a law, "or the cause which induced the Legislature to enact it." C.C. 18. Constitutional provisions, no less than other laws, should be construed so as to give effect to the purpose indicated by a fair interpretation of the language used. See Barnett v. Develle, 289 So.2d 129, 146 (La.1974). In the event of conflict or inconsistency, provisions should be construed, if possible, to allow each provision to stand and be given effect. Id.
The board's strongest argument, and the one found convincing by the Court of Appeal, is based on R.S. 38:1235.2(A), the actual land grant. The board reads it to contain three distinct grants: "[1] to all public property necessary for the purposes hereof [2] and all lands reclaimed or filled in ... and [3] in and to all lands lying within the territorial limits of [said] a project." The board argues that three grants are meant, each moving progressively further from the shore. The grant in the third clause, however, of all lands lying within the territorial limits of the "project" surely was not intended to include all land from the 1918 shoreline to three miles out. Such an interpretation would necessarily include any reclaimed areas, and would render clause [1] and clause [2] redundant. If the intention was to grant title to the levee board over the entire three mile area, and if "project" means the entire area, then the language of clause [3] above would have sufficed.
It is more reasonable to assume that "project" means the area on the shore side of any front line which the board might establish. The area beyond such a *610 line, except for dredging, is precisely where there would be no "project." Such a line would be where the "project" ends.
Such an interpretation would not reduce clause [3] to "surplusage," as argued by the board. A reading of the provisions leads to the conclusion that a certain amount of redundancy exists, possibly due to an overabundance of caution. Clause [3] is more reasonably read as a sort of residuary clause which makes clear that all lands within a reclamation project would be owned by the board.
This is reinforced by R.S. 38:1235.1(F), a somewhat curiously placed provision which grants title to public things within the area of works and reclamation. Though not in the section entitled "land grants," this provision is indisputably a land grant of public things. See C.C. 450. A reasonable reading in this case does not compel a conclusion that each phrase refers to separate parcels of public property. R.S. 38:1235.1(F) is indistinguishable from clause [2] above in R.S. 38:1235.2(A).
A reasonable view of the evolution of the amendments indicates that the legislature and the people realized that the increasingly ambitious nature of the board's plans required a grant broad enough to allow major dredging operations. The twenty-five hundred foot area was clearly inadequate to provide enough fill. At the same time, the need to have to come to the people periodically in the form of a constitutional amendment to gain increased authority was undesirable. Already, three amendments in twelve years had been necessary. The 1928 amendment envisioned subdivisions, an airport, parks and golf links, among other things. See R.S. 38:1235.1(B)(3) and (C). R.S. 38:1235.1 generally confers on the board the power and authority within the three mile area to carry out its plans. It does not grant title to anything except public things within the area of reclamation and improvement. R.S. 38:1235.1(F). It is significant that authority to conduct dredging operations was conferred by the same amendment which increased the board's authority to the area three miles from the 1918 shoreline.
In making such a grant of authority, the legislature and people, no doubt realizing the amount of discretion they were vesting in the board, attempted to provide safeguards to control such discretion: plans were required to be submitted to the Board of State Engineers (R.S. 38:1235.1(A)); development was to occur in stages and the area was divided into zones, the westernmost of which was to be completed first (R.S. 38:1235.1(B)); the public bid law would apply (R.S. 38:1235.1(I)); and a commission composed of persons from real estate, business and politics were given the power to approve a general plan of disposition for reclaimed land (R.S. 38:1235.2(A) and (D)).
We conclude that the intent of these provisions was to provide the board with administrative authority over an area large enough to carry out its ambitious development plans without the need for periodic constitutional amendments. This purpose has been met; no further changes in the board's authority have been necessary. In order to finance the project, the board was given title to those areas reclaimed, and the board was given the power to alienate what otherwise would have been a public and inalienable thing, namely, the shore, bed and bottom within such reclaimed areas. Rather than set an exact line in the Constitution, the people and legislature left it to the board's discretion how best to carry out the plans in light of the financial, physical and engineering realities of such a project.
There is a strong public policy in this state that control of public things should remain in the hands of the state, absent a clear and unambiguous intent to relinquish such control. Cf. La. Const. Art. 9, § 3 (1974); Gulf Oil Corporation v. State Mineral Board, 317 So.2d 576 (La. 1975). Although the board is itself a state agency and the lands involved remain public things, analogous policy considerations and reasoning should apply with respect to any grant from the state to such an agency. The grant in this case is neither specific *611 nor express, and it should not be presumed or implied. Cf. Gulf Oil Corporation v. State Mineral Board, supra, at 589. Read in their entirety, the provisions do not evince an unambiguous intent to grant to the board rights of ownership over areas beyond the front line of development.
For the reasons assigned, the judgment of the Court of Appeal is reversed, and the judgment of the trial court is reinstated:
"IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the State of Louisiana, the Department of Natural Resources and the Louisiana State Mineral Board, declaring and recognizing the right of the State of Louisiana to the ownership of that portion of the bed and bottom of Lake Pontchartrain situated in Orleans Parish which has not been reclaimed or filled in by the Board of Commissioners of the Orleans Levee District in connection with any authorized levee project.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the State of Louisiana, the Department of Natural Resources and the Louisiana State Mineral Board, recognizing the right and authority of the Louisiana State Mineral Board to enter into leases for the development of the mineral resources of that portion of the bed and bottom of Lake Pontchartrain situated in Orleans Parish which has not been reclaimed or filled in by the Board of Commissioners of the Orleans Levee District in connection with any authorized levee project.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the Board of Commissioners of the Orleans Levee District declaring and recognizing the right of the Board of Commissioners of the Orleans Levee District to the ownership of the mineral rights to that portion of the bed and bottom of Lake Pontchartrain situated in Orleans Parish which has been reclaimed or filled in by the Board of Commissioners of the Orleans Levee District in connection with any authorized levee project."
CALOGERO, J., dissents and assigns reasons.
CALOGERO, Justice, dissenting.
I consider the majority opinion a strained interpretation of La. Const. art. 16 § 7(h) (as amended in 1928).[1] It provides in pertinent part:
State land grants. To enable the said Board to perform the work herein provided for and to assist in defraying the cost and expenses thereof, and to carry out the purposes of existing laws and this Article of the Constitution, the State of Louisiana hereby grants and releases to said Board the title of the State in and to all public property necessary for the purposes hereof and all lands reclaimed or filled in within any levee embankments, slopes, retaining walls, sea walls, and breakwaters constructed hereunder and in and to all lands lying within the territorial limits of said project and hereby releases said land from any public trust or dedication.... (Emphasis provided)
It is hard for me to imagine how the Constitution could have more explicitly granted title to the Orleans Levee Board of the state property at issue than to include (1) all public property necessary for the purposes hereof, (2) all lands reclaimed or filled in within any levee embankments, etc. constructed hereunder, and (3) all lands lying within the territorial limits of said project. From the history of art. 16, it becomes apparent that the initial grant of a right of way was gradually expanded by constitutional amendment to encompass title to the full extent of the so-called Lakefront Improvement Project.
Furthermore, comparison with the analogous granting authority to the Public Improvement *612 Districts within Jefferson Parish reveals that that grant only included "lands lying within the territorial limits of said project, when said land shall have been reclaimed and filled in" and reserved to the state of Louisiana "the mineral rights on any and all said lands." La. Const. art. 14 § 38 (1921). It must be assumed that were the grant to the Orleans Levee Board to include only that portion of the lake bed actually reclaimed, the language of their grant would have paralleled that to the Jefferson Improvement Districts, which left no doubt as to its extent.
And, in any event, should not the majority at least concede that title to the lake bed from a line east of the industrial canal to the eastern end of the project area, where the development is not complete and no "front line" has been established, is yet in abeyance?
For these and further reasons assigned by the Court of Appeal, I respectfully dissent.
NOTES
[1] Both parties refer the court to the provisions of La. Const. of 1921, Art. 14, § 38(a), (d) and (g) (1952). (See Acts 1952, No. 529, adopted Nov. 4, 1952). These provisions unambiguously anticipate and resolve the issues in the present case with regard to Jefferson Parish Improvement Districts along Lake Pontchartrain. Both parties seek to have the court draw opposite inferences based on the clarity of these provisions as opposed to those in this case. However, little weight may be attached to these provisions since they were drafted and adopted some twenty-four years after the ones at issue here. They were, in addition, amended by Acts 1964, No. 555, adopted Nov. 3, 1964 and by Acts 1966, No. 554, adopted Nov. 8, 1966. They have not yet been reenacted as statutes as provided for in La. Const., Art. 14, § 16(A)(10) (1974). See La. Const. of 1921, Art. 14, § 38 (West Supp.1984) (Constitution Ancillaries).

In light of our ultimate holding in this case, it is, however, significant that the people and legislature, in the Jefferson provisions and in those referred to in State v. Grace, 161 La. 1039, 109 So. 830 (1926), provided for the issuance of patents for the reclaimed land by the Register of the State Land Office whenever they unambiguously contemplated an actual and complete transfer of ownership rights to a state agency. E.g., La. Const. of 1921, Art. 14, § 38(d) (1952 and 1966).
The parties have not cited to the court any such provision in the present case, nor has one been found. Neither is there any such patent in the record for lands reclaimed by the board, much less one for those portions of the lake beyond the front line of development.
[1] The provision at issue was not included in the 1974 Constitution, but was enacted as R.S. 38:1235.2(A).