483 So.2d 958 (1986)
The BOARD OF COMMISSIONERS OF the ORLEANS LEVEE DISTRICT
v.
The DEPARTMENT OF NATURAL RESOURCES of the State of Louisiana.
Nos. 85-CA-1448, 85-CD-1102 and 85-CD-1107.
Supreme Court of Louisiana.
February 24, 1986.
Rehearing Granted May 15, 1986.
*959 William J. Guste, Jr., Atty. Gen., Elizabeth Megginson, David C. Kimmel, Asst. Attys. Gen., for D.N.R.
William E. Wright, David P. Banowetz, Jr., Baldwin & Haspel, James Magee, New Orleans; David P. LaNasa, Dale B. Morrison, New Orleans, for defendant-intervenor.
Sam A. LeBlanc, Franklin Adkins, Adams & Reese, Richard Goins, New Orleans, for Board of Com'rs of Orleans Levee Dist.
Michael R. Fontham, Catherine N. Garvey, Paul L. Zimmering, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for plaintiff-intervenor.
CALOGERO, Justice.
We review here a judgment of the Nineteenth Judicial District Court, Parish of East Baton Rouge, holding Act 233 of the 1984 Legislature unconstitutional. By that enactment, the Legislature attempted to return land known as the Bohemia Spillway to the owners or their successors from whom the property was acquired by Orleans Levee Board expropriation or threat of expropriation in the years 1924-1926.
Article VII, § 14(A) of the 1974 Louisiana Constitution prohibits the loaning, pledging or donating of "the funds, credit, property, or things of value of the state or of any political subdivision."[1] Article VII, *960 § 14(B), however, sets forth exceptions to this prohibition, designated "authorized uses".[2] On October 22, 1983, the voters of the state of Louisiana ratified an amendment to Article VII, § 14(B), adding an exception for:
(4) the return of property, including mineral rights, to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation, when the legislature by law declares that the public and necessary purpose which originally supported the expropriation has ceased to exist and orders the return of the property to the former owner under such terms and conditions as specified by the legislature.
The provisions of § 14(B)(4) are, of course, not self-operating, and a "donation" (or, as pertinent to property earlier expropriated, "the return of [such] property") under this amendment is permitted only when and if the Legislature by law (1) declares that the public and necessary purpose which originally supported the expropriation has ceased to exist, and (2) orders the return of the property to the former owner; (3) under such terms and conditions as specified by the Legislature.
By Act 233 of 1984 the Legislature implemented article VII, § 14(B) and sought to return land known as the Bohemia Spillway[3] to its former owners or the successors of its former owners from whom the property was acquired by expropriation or by purchase under threat of expropriation. 1984 La. Acts No. 233 provides:
Be it enacted by the Legislature of Louisiana:
Section 1. Pursuant to authority of Louisiana Constitution Article VII, Section 14(B), the Legislature of Louisiana hereby declares that the public and necessary purpose set forth in Act No. 99 of 1924, which may have originally supported the expropriation of property, or any right of ownership thereto, on the east bank of the Mississippi River in the parish of Plaquemines for the construction of a spillway, known as the Bohemia Spillway, has ceased to exist insofar as it ever may have affected the ownership of property, including mineral rights. The Legislature of Louisiana hereby orders the Board of Levee Commissioners of the *961 Orleans Levee District, the board, to return the ownership of said property to the owners or their successors from whom the property was acquired by expropriation or by purchase under threat of expropriation. Neither the provisions of this Act nor any actions pursuant to this Act shall affect the title to land which was the subject of litigation on the effective date of this Act.[4]
The Board of Commissioners of the Orleans Levee District (hereinafter Levee Board) contended in the district court, in significant part successfully, that Act 233 of the 1984 legislative session, which would operate to transfer this property from the Levee Board to the former owners or their successors, violates the state constitution, including Article VII, § 14(B) which it was designed to implement.[5]
*962 Specifically, the Board argues that the uncompensated taking of property belonging to the Levee Board effected by the passage of Act 233 violates La. Const, art. I, § 4, the constitutional provision guaranteeing the right to property; that Act 233 exceeds the authority of art. VII, § 14(B)(4), the very constitutional amendment which Act 233 attempts to implement, inasmuch as the act attempts to return land to former owners through expropriation (of Levee Board lands by the state) rather than by donation, and by attempting to return land to successors of former owners as well as to former owners; and that Act 233 changes the make-up of the Levee Board in violation of La. Const, art. VI, § 38, when it "severs the Bohemia Spillway from the body of the Orleans Levee Board," a spillway which "has been part of the Levee Board's `constitution' since 1924." Additionally the Levee Board and intervenor, Howard, Weil, Labouisse, contend that Act 233 offends Art. XIV, § 25 of the 1974 Louisiana Constitution in that it tends to impair the obligation, validity, or security of Levee Board bonds authorized under the Constitution of 1921. The foregoing generally identifies the arguments presented in support of the contention that Act 233 is unconstitutional although numerous ancillary sub-arguments permeate the multiple briefs submitted on behalf of the various parties and intervenors.
Opponents of Act 233 of 1984, as noted somewhat more specifically hereinabove, essentially contend that Art. VII, § 14 including subsection B(4) was not intended to and does not override other constitutional provisions, and that those other provisions are offended by Act 233 of 1984; and in all events the act does not comport with Art. VII, § 14(B)(4).
First, we note that the constitutional amendment which triggered passage of Act 233 of 1984, namely the present Art. VII, § 14(B)(4), is a valid amendment, having been adopted by the people of the state in full compliance with Art. XIII, § 1, the Louisiana constitutional provision which sets out the procedure for amending the constitution. No one contends to the contrary. And, the constitution is the paramount law, to which all other laws must yield.
Our principal focus, then, will be on the specific constitutional provision, Article VII, § 14(B), which authorizes the return of property which had previously been expropriated, or purchased under threat of expropriation, and the legislative act, Act 233 of 1984, which purports to implement it.
The jurisprudence has held that a "special [constitutional] provision prevails in respect of its subject matter over general provisions in conflict therewith." Department of Highways v. Macaluso, 235 La. 1019, 106 So.2d 455, 458 (1958). And, the latest expression of the public will supersedes earlier, more general provisions of the state constitution which conflict with it. Macon v. Costa, 437 So.2d 806, 810 (La. 1983) (citing State ex rel Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477 (1949)). In like manner, an implementing act, in full compliance with the later constitutional provision dealing with limited subject matter, will not conflict with more general constitutional requirements which predate the provision upon which the implementing act is based.
The Levee Board surely concedes these fundamental principles. However, they counter with the suggestion that there is no conflict between art. VII, § 14(B)(4) and other constitutional provisions; that § 14 simply prohibits donations, with exceptions, one of them being the return of expropriated property; that § 14, including subsections (A) and (B) were meant to have no effect if in competition with other constitutional provisions.
The constitutional article under consideration is clear and unambiguous. The return of expropriated property is permitted. *963 It would have been difficult indeed for the Legislature and the people to amend the constitution to permit the return of expropriated property other than as was done here by adopting Art. VII, § 14(B)(4).
Subsection (A) of Art. VII, § 14 provides that the loan, pledge or donation of the funds, credit, property or things of value of the state or of any political subdivision are prohibited except as allowed in the constitution. ["§ 14(A) Prohibited Uses. Except as otherwise provided by this constitution,..."] This qualifying phrase is simply designed to incorporate into Art. VII, § 14(A) exceptions contained elsewhere in the constitution, which specifically permit loaning, pledging, or donating the state's funds, credit or property.[6]
Then subsection (B) of Art. VII, § 14 added three more exceptions, now four with the passage of the constitutional amendment Art. VII, § 14(B)(4), to the prohibition against donations, loan or pledge. ["§ 14(B) Authorized Uses. Nothing in this section shall prevent (1) ..., (2) ..., (3) ... and (4) ..."] That fourth exception is the return of property previously expropriated or purchased under threat of expropriation.
Nothing about subsection (B)(4) or § 14 ties (B)(4)'s specific legislative authorization to return expropriated property, to any other provision of the constitution. § 14(B) is not circumscribed in its application.
Therefore we find that Art. VII, § 14(B)(4), a narrowly drawn and recently enacted provision, designed to accomplish a specific objective, does override all other prior constitutional provisions which may be in conflict with it.
Despite this determination, we choose to address the argument concerning the impairment of bond obligations presented by intervenor, Howard, Weil, Labouisse, holder of Series 1973 General Obligation Bonds which were purchased in October, 1984, after the constitution was amended and the Legislature had passed 1984 La. Acts No. 233. They urge that Act 233, and the taking of property of the Levee Board, impairs the security of these general obligation bonds in violation of Art. VI, § 38(B) and of Art. XIV, § 25 of the 1974 Constitution.
Art. VI, § 38(B) provides:
(B) Obligation of Contract Affirmed. No action taken under this Section shall impair the obligation of outstanding bonded indebtedness or of any other contract of a levee district.
Section 38, pertaining to levee districts, merely continues in existence levee districts as organized and constituted on January 1, 1974 (Art. VI, § 38 Subsection A), while allowing the Legislature to provide by law for consolidation, division, or reorganization of existing levee districts and to create new levee districts (Art. VI, § 38 Subsection (A)(1)); and where a levee district is situated entirely within one parish to consolidate and merge the levee district into such parish under certain terms and conditions (Art. VI, § 38, Subsection (A)(2)).
Art. VI, § 38, Subsection B provides merely that no action taken under Section 38, that is, in the respects recited in the immediately preceding paragraph of this opinion, shall impair the obligation of outstanding bonded indebtedness or of any other contract of a levee district. Act 233 is not such an action; it was not taken under Art. VI § 38; it has nothing to do with consolidating, dividing, reorganizing, or merging levee districts. Rather it was taken under and specifically authorized by Art. VII, § 14(B)(4).
Art. XIV, § 25[7] is a transitional provision designed "only to provide for an orderly *964 transition from the Constitution of 1921." Art. XIV, § 14.[8] Assuming, however, that it would otherwise invalidate Act 233, and assuming further that Howard, Weil, Labouisse can show injury within its terms, which is not entirely clear,[9] Art. XIV, § 25 is superseded by the later constitutional amendment, Art. VII, § 14(B)(4). See our discussion along these lines hereinabove.
To consider whether Act 233 comports with Art. VII, § 14(B), we will discuss Act 233 and the three applicable provisions of Art. VII § 14(B): the Legislature's declaration of cessation of public and necessary purpose; the Legislature's order of return of the property; and the terms and conditions specified by the Legislature.
(1) The Legislature's Declaration of Cessation of Public and Necessary Purpose (Act No. 233 of 1984)
In complying with La. Const. art. VII, § 14(B)(4), 1984 La. Acts No. 233, § 1 contains the language that "the Legislature of Louisiana hereby declares that the public and necessary purpose set forth in Act No. 99 of 1924, which may have originally supported the expropriation of property, or any right of ownership thereto, on the east bank of the Mississippi River in the parish of Plaquemines for the construction of a spillway, known as the Bohemia Spillway, has ceased to exist insofar as it ever may have affected the ownership of property, including mineral rights." Although the Levee Board vigorously disputed the determination that the "public and necessary purpose" supporting the creation of the Bohemia Spillway has ceased to exist, that matter is not properly before the court.
The constitution does not require that the public and necessary purpose must cease to exist, but only that the Legislature "by law declares" that this is so. The constitutional amendment thus accords to the Legislature an appropriate prerogative which is legislative in nature, and not within the realm of the judiciary's power and authority, a certain deference to the Legislature's exclusive power which is consistent with the separation of powers articles of our Constitution, 1974 La.Const. art. II, §§ 1 and 2.[10] The wisdom, or accuracy, of the Legislature's declaration in this regard is not for the Courts to assess.
Since Act 233 of 1984 has made the declaration of cessation of public and necessary purpose required by La. Const. art. VII, § 14(B)(4), it complies with that article of the constitution in this respect.
(2) The Legislature's Order of Return of the Property (Act No. 233 of 1984)
The amendment to Art. VII, § 14(B)(4) also requires that the Legislature order "the return of the property to the former owner." The 1984 Legislature's response in Act 233 was to order
the Board of Levee Commissioners of the Orleans Levee District, the board, to return the ownership of said property to the owners or their successors from whom the property was acquired by expropriation *965 or by purchase under threat of expropriation. (emphasis added)
The Levee Board contends that "owner" in Art. VII, § 14(B)(4) does not include a successor of the owner, and that Act 233 thus goes beyond the authorization of Art. VII, § 14(B)(4).
We do not agree with the proposition urged by the Levee Board, that the language of Art. VII, § 14(B)(4) is unambiguous and that the term "former owner" necessarily excludes successors of former owners. Although the amendment does not specify successors, as does Act 233, it likewise does not speak only of surviving former owners. The interpretation of this phrase in the Constitutional provision is a matter for this Court.
It is clear from the legislative committee discussions of House Bill No. 56, enacted as 1983 La. Acts No. 729, and ultimately ratified as Art. VII, § 14(B)(4), that the bill, was designed to address the return of the lands of the Bohemia Spillway. The passage of the joint resolution which was placed on the ballot for statewide voter approval was the culmination of a successful lobbying effort undertaken largely by heirs and successors of former owners of the Bohemia Spillway property. In fact, minutes from the House Committee on Civil Law and Property, which favorably recommended the bill to the full House, specifically refer to heirs and successors of the former owners, who were in attendance at the Committee hearing. It is inconceivable that the Legislature or the people intended to enact a constitutional amendment which would benefit only individual owners who might have survived this fifty-nine year period (from expropriation and threatened expropriation, 1924 to 1926, until passage of the enabling act and adoption of the Constitutional amendment in 1983) and some few corporations.[11] It is fairly certain, and conceded by the parties, that most of the owners from whom property was taken or purchase under threat of expropriation between 1924 and 1926, are deceased.
Furthermore, and not without some weight, we note that Louisiana law and tradition, of which the Legislature is fully cognizant, recognizes a kind of continuum from owners of property or possessors of rights in property to their universal successors. An heir succeeds to the full extent of the rights of the deceased, and the succession of the legal heir follows from the moment of the decedent's death. La.Civ. Code Ann. arts. 943 and 946. The heir represents the deceased in all matters and is authorized to institute all actions which the deceased had a right to institute. La. Civ.Code Ann. art. 945. And the rights to which the heir succeeds and for which he may institute legal action include the rights of the deceased which accrue after his death. La.Civ.Code Ann. art. 872. In succeeding to all of the deceased's rights, the universal successor merely continues the deceased's possession rather than beginning a new possession. Bartlett v. Calhoun, 412 So.2d 597 (La.1982) (quoting Planiol, Civil Law Treatise, Part 2, Sec. 2674 (12th Ed. La.St.L.Inst.trans. 1959)). Similarly, Professor Yiannopoulas has stated in his Louisiana Civil Law Treatise, Property 325-26, 2d Ed., § 126 (1980), "[t]he succession, that is the patrimony of the deceased,... is an indistinguishable part of the patrimony of the heir."
For these reasons, we conclude that the right to reclaim ownership of land, expropriated or purchased under threat of expropriation by the Levee Board, granted by La. Const. Art. VII, § 14(B)(4) extends to the successors of the owners as well as to surviving former owners, including corporations. Therefore, 1984 La. Acts No. 233 complies with the art. VII, § 14(B)(4) insofar as it orders a return of the property to the former owners or their successors.
(3) Terms and Conditions Specified by the Legislature (Act No. 233 of 1984)
The third requirement, or provision, of Art. VII, § 14(B)(4), relative to return of *966 expropriated property, is the inclusion of "such terms and conditions as specified by the Legislature."
It is contended by the Department of Natural Resources and its allies that § 5 of Act 233 provides terms and conditions, or such terms and conditions as the Legislature chose to specify. That section of the act stipulates that the return of property shall be subject to any servitudes or rights-of-way, surface or mineral leases, or any other valid contract executed by or with the Levee Board prior to the act's effective date, and requires that the deed so state. Further, there is provision for making payments, giving notices, or renegotiating an existing contract prior to the actual transfer of title to the property. (See footnote 4 supra.) These directives are certainly "terms and conditions" of the return. It is not appropriate for the courts to "test the wisdom of the legislature" and dispute the adequacy of the terms they have assigned. Sevin v. Louisiana Wildlife and Fisheries Commission, 283 So.2d 690, 692 (La.1973). The constitutional amendment simply authorizes the return of expropriated property by the Legislature under such terms and conditions as the Legislature chooses to specify.
The Levee Board insists, however, that the inclusion of the phrase "terms and conditions" was designed primarily to require the Legislature to effect each return in a manner that insures against adverse fiscal impact, that is, to insure compensation when appropriate. In this case, the Levee Board foresees a substantial adverse fiscal impact because of lost royalty income and the concomitant impairment of the marketability of Levee Board bonds. Therefore, they conclude that Act 233 is fatally flawed by its failure to provide compensation as a term or condition of the return. The district court apparently agreed with the Levee Board's position in this regard. On April 8, 1985, the Levee Board's motion for summary judgment was granted on the ground that "Act 233 is unconstitutional because it fails to establish the terms and conditions for the return of land of political subdivisions which are required by the City of New Orleans v. State, 443 So.2d 562 (La.1984)." And, in his oral reasons for judgment, the trial judge described Act 233 as an "outright gift." The judge apparently relied on City of New Orleans v. State for the proposition that the taking of the property of any political subdivision must be for a public purpose only, and with just compensation.
The language of the constitutional amendment provides no support for this position, that a required term or condition is compensation. Nonetheless, the Levee Board points to the May 23, 1983 meeting of the House Committee on Civil Law and Procedure which discussed House Bill No. 56, the antecedent of Art. VII, § 14(B)(4). At that time, there was discussed the failure of a similar bill in the House the previous year and inclusion of new or different language, "terms and conditions," in the bill, later adopted, which was then under Committee consideration. The discussion included an expression of concern for the amendment's potential fiscal impact on the state and assurances that this factor would have to be considered when and if the Legislature were later to determine that any given property is no longer needed for a public purpose.
That committee discussion, including reference to the fact that conditions, including compensation, might properly be entertained by a later Legislature seeking to implement Art. VII, § 14(B)(4), is hardly helpful to the Levee Board's position. Surely compensation might be a term or condition imposed in a given implementation of Art. VII, § 14(B)(4). Compensation, however, was not a term the Legislature chose to specify in Act 233 of 1984. § 14(B)(4) does not require compensation, but only such terms and conditions as the Legislature specifies.
Nor do we perceive that City of New Orleans v. State, 443 So.2d 562 (La.1984)[12] *967 dictates the requirement of compensation in this case. Although some language in the opinion supports the conclusion of the trial judge and the arguments of the Levee Board with regard to the applicability of La.Const. art. I, § 4,[13] that decision narrowly held:
[t]he 1974 Louisiana Constitution does not allow the state to take without payment any public thing belonging to a municipality. On the contrary, the rights of local governmental entities are protected by Article VI, § 6. [emphasis added]
Article VI, § 6 restrains legislative interference in the affairs of "any local governmental subdivision which operates under a home rule charter." The Orleans Levee Board is not a "local governmental subdivision," defined in La.Const. art. VI, § 44(1) as "any parish or municipality," and obviously has no home rule charter. Although La.Const. art. VI, § 38 continues to recognize "[l]evee districts as organized and constituted on January 1, 1974," the powers of the Orleans Levee Board, previously articulated in 1921 La.Const. art. XVI, § 7, have been placed in the revised statutes (at La. Rev.Stat. § 38:1235 et seq.). This change from constitutional to statutory authority permits the Legislature a greater opportunity to define the duties and responsibilities of levee boards. The nature of levee boards and degree of Legislative power and authority over them distinguishes them from local governmental subdivisions operating under home rule charters. Moreover, we re-emphasize that the state action here, which is designed to take certain revenue producing property from the Orleans Levee Board and return it to former owners, is itself based in the constitution. It is not simply an action of the state Legislature such as that successfully challenged in City of New Orleans v. State.
On the basis of the above analysis of the three essential provisions of Art. VII, § 14(B) and the provisions of Act 233 of 1984 we find that the act comports with the specific requirements of the constitutional provision, the 1983 amendment which it was enacted to implement.
Another major contention which the Levee Board and its supporters urge upon the court is that the return of the Bohemia Spillway to the former owners under Art. VII, § 14(B)(4) by means of Act 233 or any other act, is prohibited. They contend that La.Const. art. VII, § 14(B)(4) only permits the Legislature to donate, or return, property already owned by the state; that the expropriation by the state of property of a political subdivision for the purpose of donating it to private individuals is not allowed. In this regard, it is argued that Art. VII, § 14(B)(4) permits the return of property by donation, loan, or pledge and that the state cannot donate, loan, or *968 pledge the Bohemia Spillway, which it does not own. For the property known as the Bohemia Spillway to be donated to the former owners, or their successors, a two step process is required, under this theory. First, the state must expropriate the property owned by the Levee Board; second, the property may then be donated by the Legislature to private individuals. Since the 1983 amendment does not endorse the return of formerly expropriated property by still another expropriation, it is suggested that it is impossible to return the Bohemia Spillway to the former owners under its provisions.
This argument implicates the ownership of the Bohemia Spillway as well as the quality of ownership enjoyed by the Orleans Levee Board. The Orleans Levee Board is empowered to own property. La. Rev.Stat.Ann. § 38:1235.1, added to the Revised Statutes by 1975 La. Acts No. 729, § 1, provides that the Board "shall have and exercise all and singular the powers now conferred upon that board by law," and 1890 La. Acts No. 93 had conveyed to the Levee Board the right "to acquire, hold, own and convey all the property, real and personal, needful in the premises." Thus, the Levee Board may own property, and Act 99 of 1924 provided "for the acquisition of the fee title of the lands embraced in the [Bohemia] spillway and for such title to be reposed in the Orleans Levee Board." Emery v. Orleans Levee Board, 207 La. 386, 21 So.2d 418, 421 (1945). Subsequently, by means of 1942 La. Acts No. 311, the Legislature "confirmed, quieted and acknowledged" the Levee Board's "right, title, ownership and possession ... to all public lands in the area of the Bohemia Spillway." And, more recently, the Fourth Circuit Court of Appeal affirmed the Levee Board's ownership of all land in the Bohemia Spillway, which was formerly private, through acquisitive prescription. Succession of Buras v. Board of Levee Commissioners, 469 So.2d 1022 (La.App. 4th Cir. 1985) writ den. 475 So.2d 1095 (La.1985).
Our finding that the Orleans Levee Board "owns" the Bohemia Spillway, however, is not determinative of the issue. Earlier decisions of this Court have held that a political subdivision's ownership of land vis-a-vis the state is not absolute. As stated in Board of Commissioners of Caddo Levee District v. Pure Oil Co., 167 La. 801, 120 So. 373, 376 (1929):
the expression "absolutely vest," used in these and similar acts, in connection with the title given, must be interpreted with reference to the nature or character of the grantee. The grantee, under these and similar acts, is an artificial person, created for the accomplishment of public purposes, developing primarily upon the state. The Legislature, having created plaintiff for public purposes, may revoke the grants made to it, notwithstanding the declaration as to the absolute vestiture of title, by abolishing plaintiff,[14] or by withdrawing the grants, provided that, in doing so, it does not interfere with rights acquired by third persons.
And, again in 1956, the Court reaffirmed the Orleans Levee Board's status as a "creatur[e] or agenc[y] of the State," and the State's right "to abrogate, rescind and nullify any grant of title to land made by it to one of the districts and to vest complete title thereto in the other." Richardson & Bass v. Board of Levee Commissioners of the Orleans Levee District, 231 La. 299, 91 So.2d 353, 372 (1956) (on second rehearing). In Richardson & Bass, a concursus proceeding in which the Grand Prairie Levee District unsuccessfully contested the Legislature's transfer of "their" property within the limits of the Bohemia Spillway to the Orleans Levee District,[15] the Court further asserted that
by the act quieting title in the Orleans Levee Board the State ... was only placing *969 the property under the control of one of its agencies for supervision and administration. The land to all practical intents and purposes is still the property of the State. Id. at 360.[[16]]
The Levee Board, however, would explain away this jurisprudence on the basis of changes in the 1974 Constitution. They contend that certain clauses of the 1974 Louisiana Constitution now protect public property from uncompensated takings. Of particular significance, according to the Levee Board, are Art. VI, 38(A), which constitutionally recognizes levee districts as organized on January 1, 1974; Art. VI, § 23, which permits political subdivisions to acquire property; and Art. I, § 4, which provides that property shall not be taken by the state except for public purposes and with just compensation. As pointed out earlier in this opinion, the constitutional recognition accorded the Orleans Levee district in art. VI, § 38(A) is not particularly helpful to the Board. While the levee board is given constitutional status, its power and authority has been relegated to the revised statutes, thus placing them in large measure under control of the Legislature. And, the qualifying language at the outset of Art. VI, § 23, which permits a political subdivision to acquire property, "[S]ubject to and not inconsistent with this Constitution and subject to restrictions provided by general law," hardly suggests a change to the jurisprudence which has allowed the Legislature to nullify any grant of title of land to a levee board and to vest title in another. Finally, the proposition that the constitutional provision, Art. I, § 4 (which does not clearly address public property), bars this return of expropriated property to the former owners or successors is supported only by a strained statutory construction,[17] and dicta in City of New Orleans v. State (note earlier discussion of that case herein). It does not persuade us to disregard Board of Commissioners of Caddo Levee District v. Pure Oil Co. and Richardson & Bass v. Board of Levee Commissioners of the Orleans Levee District and to declare an act unconstitutional which is in full compliance with a directly applicable constitutional amendment.
The Legislature was free to return the Bohemia Spillway property under La. Const. art. VII, 14(B)(4), and they chose to do so when they passed Act 233 of 1984.

Decree
For the foregoing reasons the judgments of the district court granting plaintiff relief in the form of preliminary and permanent injunctions, upon finding Act 233 of 1984 unconstitutional, are reversed and set aside. The ruling of the district court denying defendant's motion for summary judgment is reversed; summary judgment dismissing plaintiff's demand at its costs is *970 granted. Act 233 of 1984 is hereby declared constitutional.
REVERSED; SUMMARY JUDGMENT IN FAVOR OF DEFENDANT GRANTED; PLAINTIFF'S PETITION DISMISSED.
DIXON, C.J., concurs in part and dissents in part.
BLANCHE, J., dissents being of the opinion that insofar as Act 233 orders the return of property to the heirs of the original owners, it exceeds the legislator's constitutional authority under Article 7 Sec. 14(B) and thus violates Sec. 14(A). See Chief Justice DIXON'S concurrence and dissent with which this writer agrees.
WATSON, J., dissents and assigns reasons.
DIXON, Chief Justice, concurring in part and dissenting in part.
I respectfully concur in part and dissent in part.
Nothing in these consolidated appeals requires us to hold that Act 233 of 1984 supersedes all general constitutional provisions predating Article 7, § 14(B)(4), and I do not join in this pronouncement. Nevertheless, the majority correctly rejects those claims presented under Article 1, § 4, Article 6, § 38(B) and Article 14, § 25.
Insofar as Act 233 orders the return of property to the heirs of original owners, however, it exceeds the legislature's constitutional authority under Article 7, § 14(B), and thus violates § 14(A). The former section in pertinent part permits "the return of property, including mineral rights, to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation..." This language is unambiguous and should be respected. E.g., Aguillard v. Treen, 440 So.2d 704, 707 (La.1983). Heirs are not former owners; they are not persons from whom the property had previously been expropriated, and they are not persons from whom the property had previously been purchased under threat of expropriation. They should not prevail in this action.
The majority looks to legislative history and suggests the drafters of this constitutional provision meant "former owners" to be synonymous with "heirs of former owners." It is true that the legislative history to Act 729 contains reference to the Bohemia Spillway and to the heirs of former owners. Section 14(B)(4) of course refers to neither. It is also true that the legislature resolved, in 1981, to compensate the heirs of original owners, but that House Bill 151 of the 1982 Regular Session, a proposal similar to Act 729 except that it specifically authorized the return of the Bohemia Spillway, failed when put to vote before the House. In view of the unsuccessful 1982 bill, I find it difficult to conclude that the legislature meant what it did not say just one year later.
Even more tenuous is the assumption that the majority of voters who approved Article 7, § 14(B)(4) in its present form ascribed any such meaning to this provision. A constitutional amendment is ratified by statewide referendum. While it is safe perhaps to suggest that those casting ballots in Plaquemines Parish did so with the Bohemia Spillway in mind, the same cannot be said of voters elsewhere in Louisiana.
We have recognized that:
"... where the language of a constitutional provision is clear, as is the case here, we cannot decide constitutional questions on the basis of the drafters' debate, but must rely on the finished product, which is the expression of the voters who adopted the constitution." The Bank of New Orleans and Trust Co. v. Seavey, 383 So.2d 354, 356 n. 7 (La.1980).
We have also recognized the "strong public policy in this state that control of public things should remain in the hands of the state, absent a clear and unambiguous intent to relinquish such control." State ex rel. Guste v. Board of Commissioners of the Orleans Levee District, 456 So.2d 605, 610 (La.1984). The instant case calls for rigid application of both principles. This court should not impute to the people of *971 this state an intent not found in such a clear and unambiguous constitutional provision as § 14(B)(4).
WATSON, Justice, dissenting.
I respectfully dissent.
When the legislature passed Act 729 of 1983, amending the Louisiana Constitution of 1974,[1] to provide for the return of land and mineral rights to their former owners, and passed Act 233 of 1984 attempting to return the Bohemia Spillway to both the original owners and their successors, it enacted a massive give away of the state's resources.
I. Act 233 of 1984 is unconstitutional insofar as it:
A. orders the return of property to the heirs of the original owners, thereby exceeding the constitutional authority granted by Art. 7, § 14(B) which limits such return to a "former owner";
B. conflicts with the constitutional command that the legislature enact laws to protect, conserve and replenish the state's natural resources, Art. 9, § 1; and
C. impairs the validity of contracts, Art. 1, § 23.
II. The legislative pronouncement that the public and necessary purpose supporting the original expropriation has ceased to exist is erroneous and subject to judicial review as an abuse of discretion.
I. A. LSA-Const. 1974, Art. 7, § 14(B) permits "the return of property, including mineral rights, to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation...." Under Aquillard v. Treen, 440 So.2d 704, 707 (La.,1983), this unambiguous language must be respected. Constitutional questions must be decided on the basis of the finished product approved by the voters, rather than the drafters' debates. The Bank of New Orleans and Trust Co. v. Seavey, 383 So.2d 354, 356, n. 7 (La.,1980). The phrase "former owners" is not synonymous with "heirs of former owners".
B. The loss of the spillway and its revenues will have a severe, adverse, long-range impact in the areas of hurricane protection and flood control, requiring the raising of other levees to a greater height at a cost of $72 million. In addition, railroad tracks, utilities and port facilities will have to be raised or moved at an almost incalculable cost. This "fuse plug" levee prevents silt from damaging oyster beds below the levee; a side effect of the loss of the Bohemia system will be further encroachment of salt water, causing faster attrition of our fresh water marshes which protect the coastline during storms and help keep the ecological balance. Act 233 is in conflict with Art. 9, § 1, which commands the legislature to enact laws to protect, conserve, and replenish this state's natural resources.[2]
C. Act 233 impairs the validity of the mineral leases and contracts of the Board of Commissioners of the Orleans Levee District, as well as the bonds held by Howard, Weil contrary to the state and federal constitutional prohibitions against impairment of contracts.[3] Series 1973A bonds issued under authority of the 1921 Constitution and held by Howard, Weil are secured, not by the full faith and credit of the state, but by the full faith, credit, and resources of the Orleans Levee District. They are payable first from tax levies and then from other funds of the District. Act 233 deprives the Board of some $4,000,000 annually (about one-fourth of its revenues) without replacing it from other sources. Orleans tax levies, presently limited by the Constitution to 5 ½ mills, are the highest in the state, and cannot be increased without approval of the district voters, which cannot be lightly assumed. The repeal of a covenant which limits the use of revenues *972 available to pay bonds causes an impairment of contracts because it permits a "diminution of the pledged revenues". United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). State impairment of obligations is permissible under the contract clause of the United States Constitution only when it is "reasonable and necessary to serve an important public purpose." [4] The admittedly important public purpose in United States Trust Company of increasing mass transit facilities was insufficient to validate a statute impairing obligations.
An impairment of the United States contract clause also impairs Louisiana's contract clause. Louisiana Gas Service Co. v. Louisiana Public Service Commission, 245 La. 1029, 162 So.2d 555 (1964). A statute which destroys or impairs the means or remedy for enforcement of an obligation impairs the obligation itself.[5] The value of a contract cannot be diminished by subsequent legislation.[6] Contractual obligations can yield to a proper exercise of the police power only when the purpose is public and not arbitrary or oppressive. Louisiana Gas Service Co., supra. The state's purpose in divesting the Board of the Bohemia Spillway is neither important nor public; it is an outright gift to private persons.
II. The legislative pronouncement that the Bohemia Spillway no longer serves its original public purpose is arbitrary and capricious. Testimony at trial was that the Bohemia has been used sixteen times during major high water since its opening (more times than the Bonnet Carre' and Morganza combined), was last used for major flooding in 1974, and minor flooding in 1984, and in fact had water standing in it at the time of trial. On an ongoing basis, this "fuse plug" levee serves to prevent silt from ruining oyster beds below. Further, its existence is taken into account in the height and location of other levees protecting the area. A constitutional provision cannot shield an exercise of police power from the scrutiny of the judiciary. State, through Dept. of Highways v. Jeanerette Lumber & Shingle Co., Ltd., 350 So.2d 847 (La.,1977). Thus, the legislative error in pronouncing the purpose of this give away to be public is reviewable by this court.
I respectfully dissent.
NOTES
[1] La. Const. art. VII, § 14(A) provides:

§ 14. Donation, Loan or Pledge of Public Credit
Section 14. (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association or for any private enterprise.
[2] La. Const. art. VII

Section 14. (B) Authorized Uses. Nothing in this Section shall prevent (1) the use of public funds for programs of social welfare for the aid and support of the needy; (2) contributions of public funds to pension and insurance programs for the benefit of public employees; or (3) the pledge of public funds, credit, property, or things of value for public purposes with respect to the issuance of bonds or other evidences of indebtedness to meet public obligations as provided by law. [Art. 7, § 14(B), as adopted in 1974 Louisiana Constitution]
[3] The Bohemia Spillway consists of some 33,000 acres. It extends from the Bohemia Plantation, fifty miles below New Orleans on the east bank of the Mississippi River, to the Cuselich Canal. The land had been acquired by the Orleans Levee Board between 1924 and 1926, as authorized by 1924 La. Acts. No. 99, § 2, to create a naturally operating spillway which would protect the City of New Orleans from high water in the Mississippi River. The acquisition by the Levee Board involved the purchase of approximately 48% of the 33,000 acres from private owners at appraised fair market value (less than 3% of the land had to be expropriated) and the transfer of the remaining 52% of the land from the State. URS Engineers, Bohemia Spillway Hydraulic Study, Board of Levee Commissioners, Orleans Levee District 11 (December 1984). Although the purchase price for the property amounted to $389,500 in the 1920's, the same property became a major source of revenue for the Levee Board through oil and gas royalties and lease payments. In the early 1950's oil and gas revenues amounted to over $750,000 per year and at the present time provide the Levee Board with some $5,000,000 annually, or ¼ of its revenues. Approximately 40% of the royalties received by the Levee Board (or about $2,000,000) are from land acquired by the Board from the State and are presumably unaffected by Act 233 of 1984.
[4] The remainder of 1984 La. Acts No. 233 consists of the following five sections:

Section 2. The secretary of the Department of Natural Resources shall have rule making and procedure making authority consistent with the Administrative Procedure Act, R.S. 49:950, et seq., for the purpose of establishing procedures and guidelines for the receipt and evaluation of applications, notification of applicants, review of denials by hearings, relaxation of technical rules of evidence, settlement and distribution of funds for successful applications, and any other rules and procedures reasonably necessary for the orderly implementation of the return ordered herein. The secretary shall proceed immediately upon the effective date of this Act with steps necessary for the development and adoption of rules and procedures to begin the implementation of the provisions of this Act by January 1, 1985.
Section 3. The Board of Levee Commissioners of the Orleans Levee District shall provide a thorough accounting to the secretary of the Department of Natural Resources, or his designee, concerning all revenues received from the affected property. The information so provided shall be made available to applicants. The board shall comply with the spirit and letter of the rules and regulations adopted and promulgated by the secretary of the Department of Natural Resources.
Section 4. The secretary of the Department of Natural Resources shall begin steps by January 1, 1985, to notify affected persons.
Section 5. The return of property by the board to the owners or their successors shall be subject to all servitudes and rights-of-way, whether acquired by expropriation or otherwise, or surface or mineral leases, or other valid contracts executed by or with the board prior to the effective date of this Act. Any deed whereby any property is returned shall state that such property is subject to such rights. Any party to a contract in effect on the effective date of this Act with the board concerning property affected by this Act shall be entitled to make payments and give all notices required or permitted under such contract to the secretary until the title to the property affected has been transferred. When such contracts provide for renegotiation of rent between any person and the board, or provide that any person may seek approval by the board, such person shall be entitled to renegotiate such rent or to seek and obtain such approval from the secretary until the title to the property affected has been transferred. Any sum deposited with the secretary pursuant to this Act which represents rent, royalty or other sum attributable to land being returned, shall be paid by the secretary to the appropriate persons.
Section 6. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor as provided in Article III, Section 18 of the Constitution of Louisiana.
[5] Therefore, when the Department of Natural Resources, acting pursuant to Act 233, began to promulgate rules concerning the collection of claims to the Bohemia Spillway lands, the Orleans Levee Board initiated this action to have Act 233 declared unconstitutional and to have the Department of Natural Resources enjoined from enforcing it. The Department of Natural Resources responded to the suit by filing a motion for summary judgment requesting that Act 233 be upheld as constitutional. At the hearing on the rule for preliminary injunction, the Levee Board also moved for summary judgment, asking that the Act be declared unconstitutional. At the trial level, the action was resolved in favor of the Orleans Levee Board in three separate judgments, two relating to the respective motions for summary judgment and the remaining judgment concerning the Rule for Preliminary Injunction. The judgment which granted the Levee Board's Rule for Preliminary Injunction, based on the judge's finding that Act 233 is unconstitutional, and the judgment granting the Levee Board's motion for summary judgment, which declared Act 233 unconstitutional and issued a permanent injunction, have been appealed directly to this court. The judgment denying the Department of Natural Resources' motion for summary judgment, which sought to have the Levee Board's petition dismissed with prejudice on the basis that Act 233 is a valid, constitutional enactment of the 1984 legislature, is before us by virtue of our having granted the Department's application for writs, Board of Commissioners of the Orleans Levy District v. The Department of Natural Resources, 473 So.2d 848 (1985), in order that all three district court judgments would be before us.
[6] Thus, Article VII, § 6(C), which provides for the pledge of the full faith and credit of the state for the repayment of all bonds or other evidence of indebtedness, is not in conflict with Article VII, § 14.
[7] § 25. Impairment of Debt Obligations Prohibited

Section 25. Nothing in this constitution shall be construed or applied in such a manner as to impair the obligation, validity, or security of any bonds or other debt obligations authorized under the Constitution of 1921.
[8] § 14. Limitation on Transitional Provisions

Section 14. Nothing in this Part shall be construed or applied in such a manner as to supersede or invalidate or limit or change the meaning of any provision of the foregoing Articles of this constitution, but only to provide for an orderly transition from the Constitution of 1921.
[9] Intervenor's witness, an investment banker in charge of municipal bond trading, admitted that Act 233 had not had an adverse impact upon at least one Levee Board bond issue after its adoption. The fifty million dollars worth of bonds sold in November of 1984 received a Moody's rating of "A," received the lowest possible interest rate at the time, and were marketed "smoothly." This occurred notwithstanding a paragraph in the bonds' prospectus, which discussed both La. Const. art. VII, § 14(B)(4) and 1984 La. Acts No. 233.
[10] La. Const. art. II, §§ 1 and 2 provide:

Section 1. The powers of government of the state are divided into three separate branches; legislative, executive, and judicial.
Section 2. Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others.
[11] Among the 256 tracts, identified by the Department of Natural Resources in Plaintiff's exhibit No. 29, there are listed eleven owners which are not individuals, at least several of which are corporations. Among them is the intervenor, Haspel and Davis Milling and Planting Company.
[12] In City of New Orleans v. State, the city brought action against the state to enjoin implementation of a statute which abolished the Audubon Park commission, a city agency or board, and created a new commission as a political subdivision of the state with members appointed by the governor. A previously unresolved issue was the ownership of Audubon Park, an issue decided in favor of the city on the basis of title acquired in 1877 by the City Council of New Orleans. Furthermore, the court noted that although Audubon Park is open to the public, it is primarily a matter of local concern.
[13] La. Const. art. I, § 4 provides:

§ 4. Right to Property
Section 4. Every person has the right to acquire, own, control, use, enjoy protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise. However, a municipality may expropriate a utility within its jurisdiction. Personal effects, other than contraband, shall never be taken.
This Section shall not apply to appropriation of property necessary for levee and levee drainage purposes.
[14] Of course, 1974 La. Const. art. VI, § 38(A) now guarantees the existence of levee districts as organized and constituted on January 1, 1974 except for possible consolidation, division, or reorganization by the Legislature.
[15] It is a bit ironic that the Levee Board's position which prevailed in 1956 in Richardson & Bass v. Board of Levee Commissioners comes back to haunt them in this litigation.
[16] Although the quoted language occurred in the original hearing, it dealt with the court's holding that title and ownership of the Bohemia Spillway had been transferred from the Grand Prairie Levee District to the Orleans Levee District by Act 311 of 1942. The Court did not address that aspect of their original decision on rehearing.
[17] It has been suggested that the separation of art. I, § 4 into two paragraphs, the first specifying "private property" and the second lacking the qualifying word "private," indicates that the second paragraph relates to all property, public and private. Under this analysis, "[Public] [p]roperty shall not be taken ... by the state ... except for public purposes and with just compensation paid to the owner or into court for his benefit."

In response, we point out that the constitutional debates do not indicate an intent on the part of the delegates to protect political subdivisions under this section. Furthermore, § 4 was twice approved as a single paragraph and only took the two paragraph format in the Committee on Style and Drafting. The proposed § 4 was then presented to the entire convention, with no suggestion of substantive change, and was adopted without discussion.
Even without this knowledge of legislative history, however, it would be difficult to conclude that the word "property" was intended to include both public and private property. Certainly, had the constitutional delegates wanted to depart from a provision relating to private property alone, they would have specified that the "property" under contemplation included public as well as private property. An omission (of the word "private") only at the outset of the second paragraph cannot be used to suggest that the delegates intended an expanded interpretation of the word "property."
[1] Art. 7, § 14(B), approved October 22, 1983, effective November 23, 1983.
[2] Louisiana has fact pleadings; it is not necessary to plead legal theories. Thus, this question is properly before the court under the facts pleaded.
[3] LSA-Const. 1974, Art. 1, § 23; U.S. Const., Art. I, § 10, clause 1.
[4] United States Trust Company, supra.
[5] Hibernia Mortgage Co., Inc. v. Greco, 191 La. 658, 186 So. 60 (1938).
[6] Dantoni v. Board of Levee Commissioners of the Orleans Levee District, 227 La. 575, 80 So.2d 81 (1955).